528 N.W.2d 567 (1995)
In the Matter of the GUARDIANSHIP OF Curtis Dale HEDIN.
Curtis Dale HEDIN, Ward, Appellant,
v.
Julie Ann GONZALES, Guardian, Appellee.
No. 93-1460.
Supreme Court of Iowa.
March 29, 1995.
*569 Frank Cal Tenuta of Legal Services Corp. of Iowa, Sioux City, for appellant.
William K. Klinker of Smith, Grigg, Shea & Klinker, P.C., Primghar, for appellee.
Considered en banc.
LAVORATO, Justice.
Curtis Dale Hedin is the ward of his older sister Julie Ann Gonzales. Julie was appointed as Curtis' guardian in February 1986 after Curtis signed a voluntary guardianship petition. Curtis appeals from a district court order denying his petition to remove Julie as guardian and terminate the guardianship.
Curtis has preserved several issues for our review. First, he contends that the Iowa guardianship statute is unconstitutional under the federal and Iowa Constitutions because it denies him due process and, under the Iowa Constitution, the enjoyment of his liberty interest. He also maintains that the statute is unconstitutionally vague and over-broad. Second, he argues that in a voluntary guardianship termination proceeding the guardian must establish that the guardianship continue by clear and convincing evidence. In addition, he argues that in such a proceeding the burden of persuasion should shift to the guardian. Third, he believes that the guardianship should be terminated because it is no longer necessary and not in his best interests. Last, he alleges that Julie should be removed as his guardian.
The district court noted that the fighting issue at trial did not appear in Curtis' petition for removal of Julie as guardian and termination of the guardianship. Rather, the crux of the case appeared to be whether *570 Curtis should be allowed to marry his girlfriend. The girlfriend is herself under guardianship and suffers from several physical and mental disabilities and could not testify at trial because it would have an adverse impact on her well-being. Julie applied for and received a temporary injunction prohibiting Curtis from marrying until a hearing could be held to establish whether Curtis has the capacity to contract to marry. As the district court did, we limit ourselves to deciding the issues raised by Curtis' petition and preserved on appeal.
The district court considered these issues and concluded that continuation of the guardianship is in Curtis' best interests. After consideration of the issues raised, we conclude that our guardianship law provides an appropriate framework for imposing, modifying, and terminating guardianship except in two areas. First, the statute lacks sufficient objective standards when a guardianship is opened, modified, or terminated. Second, the standard of proof in all three stages of the proceedings is too low, and the burden of persuasion is on the wrong party. As to the first exception, we establish standards that we think pass constitutional muster. As to the second exception, we establish a standard of proof and a burden of proof allocation that we think likewise pass constitutional muster.
In fairness to the district court, it did not have the benefit of this opinion and therefore decided the issues contrary to these new standards and burden of proof allocation. We therefore reverse and remand with directions.

I. Factual Background.

Curtis is mildly mentally retarded. He has a full-scale I.Q. of 67, with a mental age falling somewhere between eight and eleven. He grew up on his parents' farm in northwest Iowa near Paullina. He lived at home until he was twenty. At that time Curtis had completed training at Glenwood in kitchen support skills. At the end of his training, the Glenwood staff recommended that he was able to move into the community, work, and live independently.
The Hedin family supported the recommendation. Curtis obtained a job at Bishop's Cafeteria in Sioux City. He lived alone in Sioux City for a few months but was unable to continue living independently. He returned to his parents' farm. He lived with them until 1986, when the parents sold the farm and retired to Las Vegas, Nevada. At that time Curtis was thirty-seven.
When Curtis' parents retired, they gave him three living options. He could (1) live with them in Las Vegas, (2) live with Julie, who at that time resided in Cedar Falls, or (3) stay in northwest Iowa. Curtis chose to stay in northwest Iowa. At this time Curtis, his parents, and Julie collectively arrived at the decision to (1) open a guardianship for Curtis, (2) appoint Julie as his guardian, and (3) send Curtis to Village Northwest in Sheldon to live. Village Northwest is a supervised living environment for adults with physical, emotional, and mental disabilities.
In July 1988 Julie moved to West Union in northeast Iowa. In 1990 Julie married and moved to Ames. In June 1991 she and her husband moved to New Mexico, where she currently lives.
Julie is the payee for Curtis' monthly social security check. She sends him $300 each month and he adds this to his wages to pay his living expenses. Julie keeps the balance of Curtis' monthly social security in a separate account which she uses for any extraordinary needs of Curtis that may arise.
Curtis has expressed a desire to live more independently. At Curtis' annual interdisciplinary team review in January 1992, the professional staff at Village Northwest supported such a move. The staff recommended that Curtis live either in his own apartment or Autumn Park, a rent subsidized apartment, within the year. He would continue to receive support from the Village Northwest staff.
Village Northwest sent Julie a copy of the review report containing this recommendation. Julie objected to the staff recommendation initially, but lessened her opposition after Curtis was evaluated by Dr. Stephen Mayhew.
At Curtis' annual review in 1993, the team noted that Curtis (1) was showing progress, *571 (2) was listening to advice, and (3) would benefit from making his own life decisions.
As we alluded to, Curtis has developed a serious relationship with a woman whom he testified he would like to marry. At Julie's insistence, Curtis is currently allowed to visit the woman only three times a week. Also at Julie's insistence, Village Northwest staff members must supervise these visits.
Julie did not file any annual guardianship reports until Curtis filed his petition to remove her as guardian and terminate the guardianship. The law requires the clerk of court to notify the guardian of this statutory duty. See Iowa Code § 633.669(4). Julie testified she never received any such notice, and since this point she has filed timely reports.
At some point the staff at Village Northwest reported Julie to the social security administration for allegedly mishandling Curtis' funds. Following an investigation into this allegation, the agency exonerated Julie of any wrongdoing.

II. Procedural Background.

Curtis filed a petition to remove guardian and terminate guardianship in June 1992. Before trial Curtis amended his petition, adding constitutional issues.
The case was tried to the court in August 1993. The district court, in an exhaustive decision, denied Curtis' petition to remove guardian and terminate guardianship in September. It is from this decision that Curtis appeals.

III. Historical Background.

Three areas of law most affect the personal and property decision making rights of mentally disabled persons. These areas are incompetency, guardianship, and involuntary commitment. John Parry, "Incompetency, Guardianship, and Restoration," in Samuel Jan Brakel et al., The Mentally Disabled and the Law, ch. 7, at 369 (3d ed. 1985) [hereinafter The Mentally Disabled].
Incompetency proceedings predate guardianship and involuntary commitment. As early as the first century B.C., Rome had machinery in place to protect the property of the mentally disabled. But there was no corresponding protection for their person. Id.
England and the American colonies followed this approach. Some of the colonies passed legislation to protect the estate of "insane persons" long before they passed any legislation concerning the personal welfare of the mentally disabled. Id.
England did not become concerned with the personal welfare of the mentally disabled until long after the Norman Conquest. In medieval England, the lord of the manor had responsibility for guardianship of the mentally disabled. This responsibility included protecting the property and personal interests of the mentally disabled. The driving force behind development of such a guardianship arose not from any humane concern but from a selfish one: "to prevent the mentally disabled from becoming a public burden or dissipating their assets to the detriment of their heirs." Id.
Initially this guardianship applied to mentally deficient persons only but was later expanded to include mentally ill persons. The responsibility for such persons shifted to the Crown. Id.
The Lord Chancellor exercised the Crown's guardianship through a special commission of the Crown rather than through the general authority of the chancery court. The Lord Chancellor held an inquiry to determine if the mentally disabled person was an "idiot" or a "lunatic." If such a determination was made, the Chancellor appointed a committee for the person and property of the mentally disabled person. Id.
In contrast, in this country, courts of equitythrough the common law, statutory, or constitutional provisionsassumed jurisdiction over the person and property of mentally disabled persons in the form of guardianship proceedings. The legal and philosophical basis for such proceedings is the doctrine of parens patriae. This doctrine "obligates the state to care for the vulnerable and the less fortunate." Id. at 369-70.
Legally, incompetence "defines when the state may take actions that limit an individual's *572 right to make decisions about [the individual's] person or property based on [the individual's] mental disability." Id. at 370. The limitations may be broad enough to deprive an individual of making any binding legal decisions. Or the limitations may be narrow enough to deprive an individual of making one group of decisions, like financial matters, or to one specific decision, like driving a car. Id.
Guardianship is conceptually related to incompetency in that it specifies how the incompetency determination is to be implemented. Guardianship has been described as "the most inclusive method of substituted decision making for individuals for whom it has been judicially determined that they cannot act for themselves." Id. Jurisdictions vary as to how complete this substitution may be. Some jurisdictions require that guardians make all legal decisions; others limit such substitute decision making to one or more aspects of an individual's life. Id.
Early legislation divided guardianships into actions affecting property interests (guardianships of the estate) and actions affecting personal interests (guardianships of the person). This division underscored legislative recognition that incompetency in one area of decision making did not necessarily mean incompetency in other areas. What is known as a plenary guardianship controlled both types of interests. Id.
The three forms of guardianships remain in the law today. The trend, however, is that a plenary guardianship is a "disposition of last resort." Id.
Limited guardianships are gaining popularity. In jurisdictions that recognize limited guardianships, the courts fashion a guardianship to meet the particular needs of the incapacitated person. Such a person is relieved of a specified decision making responsibility only if it is absolutely necessary. Id. In short, the guardian is assigned only those duties and powers that the incapacitated person is incapable of exercising.
Early on, involuntary commitment "was viewed as a medical action and referred to as `hospitalization.'" Id. at 374. Justification for confinement was on two grounds: treatment and the protection of society or the person from harm. Id.
During this early development, involuntary commitment and incompetency were merged. That is to say that once committed, the mentally disabled person was considered to be incompetent. No guardian would be appointed once a person was committed, leaving such person in limbo as far as exercising any rights of citizenship. Id. at 371.
Today, involuntary commitment is limited to mentally disabled persons who are a danger to themselves or the community. Treatment alone is no justification for confinement. The trend now is to make "liberty the exclusive issue to be resolved at commitment proceedings and [reserve] judgment on other rights until a formal incompetency proceeding has been held." Id. at 374. Needless to say, involuntary commitment is a "measure of last resort applicable to situations that present a serious and often an immediate danger to the mentally disabled person or the community." Id. at 375.

IV. Constitutional Concerns.

One commentator has described guardianship this way:
Guardianship is a legal mechanism for substitute decision making which comes in the guise of benevolence, as it was originally intended to protect the disabled individual and his property from abuse, dissipation of resources, and the effects of designing persons. It is an exercise of the state's role as parens patriae for the mentally and physically disabled. Yet, guardianship, in reality, reduces the disabled person to the status of a child. Few incompetent persons ever truly benefit from the guardianship system as practiced in ... most ... states.
Sheryl Dicker, Guardianship: Overcoming the Last Hurdle to Civil Rights For the Mentally Disabled, U.Ark.L.Rev.L.J. 485, 485-86 (1981) [hereinafter "Dicker"]; see also Bobbe Shapiro Nolan, Functional Evaluation of the Elderly in Guardianship Proceedings, Law, Medicine & Health Care, October 1984, at 210 [hereinafter "Functional Evaluation"] ("[G]uardianship can be a form *573 of social control.... Only the individual whose behavior passes the limit of social tolerance experiences society's benevolent control through the probate court's intervention.").
Many states operate under an "all or nothing" guardianship law, meaning that a person either is fully competent or is not fully competent to handle his or her affairs. Dicker, at 486. In these states a determination that an individual is incompetent results in a plenary guardianship over the individual's person and property. The modern view is that such a law "does not comport with reality" because the "abilities of mentally disabled persons to manage their personal and financial affairs are diverse and amenable to growth and development." Id. Moreover, the view is that "[t]he vast majority of even the most severely handicapped persons can manage their everyday affairs." Id.
Guardianship is seen as "impos[ing] lifelong constraints which result in substantial and often unnecessary forfeiture of rights," like entering contracts, borrowing money, making gifts, and choosing where to live. Id.
Today, civil commitment of the mentally ill is considered as "[having] a devastating effect on individual liberty, and therefore, stringent procedural safeguards must be applied in those proceedings." Id. at 487; see also O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396, 406-07 (1975) (no constitutional basis for confining mentally ill persons involuntarily "if they are dangerous to no one and can live safely in freedom"); Stamus v. Leonhardt, 414 F.Supp. 439, 451 (S.D.Iowa 1976) (holding that Iowa's pre-1976 civil commitment statute violated substantive due process because it did not require a finding that persons involuntarily committed pose a serious threat to themselves or others, as evidenced by a recent overt act, attempt, or threat); B.A.A. v. University of Iowa Hosps., 421 N.W.2d 118, 124-26 (Iowa 1988) (substantive due process requires that involuntarily committed persons must continue to pose serious threat to themselves or others for such commitment to continue); In re Oseing, 296 N.W.2d 797, 798 (Iowa 1980) (involuntary commitment deprives an individual of liberty through coercive state action).
Recently, several courts have agreed with commentators that a guardianship "involves significant loss of liberty similar to that present in an involuntary civil commitment for treatment of mental illness." In re Guardianship of Reyes, 152 Ariz. 235, 236, 731 P.2d 130, 131 (Ariz.Ct.App.1986); see also Youngberg v. Romeo, 457 U.S. 307, 324, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28, 42 (1982) (mentally retarded person committed to state institution has constitutionally protected right to reasonable care and safety, reasonably non-restrictive confinement, and reasonable training "to ensure his safety and to facilitate his ability to function free from bodily restraints"); Heller v. Doe by Doe, ___ U.S. ___, ___, 113 S.Ct. 2637, 2645, 125 L.Ed.2d 257, 274 (1993) ("It is true that the loss of liberty following commitment for mental illness and mental retardation may be similar in many respects.") (mentally retarded have same liberty interests as mentally ill and may not be constitutionally committed unless dangerous); Association for Retarded Citizens v. Olson, 561 F.Supp. 473, 492 (D.N.D. 1982) ("[M]entally retarded residents [of state institutions] possess a right to free association guaranteed under the First Amendment."); In re Guardianship of Braaten, 502 N.W.2d 512, 518 (N.D.1993) ("The intrusion upon individual liberty by the involuntary imposition of a guardianship upon an incapacitated ward sufficiently resembles the involuntary commitment of a mental health patient to call for similar careful standards of decision making."); In re Boyer, 636 P.2d 1085, 1090 (Utah 1981) ("Although the restrictions on, and deprivation of, personal freedom by appointment of a guardian are less in extent and in intrusiveness than by involuntary commitment, nevertheless, the loss of freedom may be substantial."); Functional Evaluation, at 214 ("There can be little doubt that there is considerable potential for violation of the defendant's constitutional rights in the guardianship process.... Although the determination of incompetency is in no way a criminal proceeding, the result in terms of the defendant's liberty interests may be very similar. He may be deprived of control over his residence, his associations, *574 his property, his diet, and his ability to go where he wishes.").
We have described some of the rights a person loses because of an incompetency adjudication. Such a loss, it has been argued, should invoke "the full panoply of procedural due process rights comparable to those present in civil commitment." Dicker, at 489. Those procedural due process rights involve the type of notice and hearing the proposed ward should have when a guardianship is being contemplated. Those rights also involve what standards a fact finder must follow in determining whether a guardianship is appropriate, what standard of proof should be employed in the hearing, and how much power the guardian should have over the proposed ward. See generally Dicker, at 489-97.
In addition, individuals have a protected interest in not being labeled mentally ill. Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The stigma of incompetence has been compared to that of mental illness. The feeling is that incompetence "may be even more egregious since it implies that one is mentally defective, untrustworthy, and irresponsible." Dicker, at 488.
In addition to this stigma, an adjudication of incompetence
causes a multitude of legal disabilities. The adjudication adversely affects an individual's reputation, right to contract, right to enter into chosen occupations, and right to engage in all of the other orderly pursuits of free persons held to involve protected liberty interests.
Id.
The Supreme Court has made it very clear that
where the State attaches "a badge of infamy" to the citizen, due process comes into play. [T]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.
Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515, 519 (1971) (citations omitted) (state statute authorized officials to post in retail liquor outlets names of persons to whom sale of liquor was forbidden because of their prior excessive drinking; held that the label given a person by such posting, though a mark of illness to some, is to others such a stigma or badge of disgrace that procedural due process requires notice and an opportunity to be heard before such posting takes place). This stigma of incompetence is still another reason to invoke procedural due process guarantees in guardianship proceedings.

V. The Issues.

Curtis contends the guardianship should be terminated because its continuation violates his liberty interest under the Fourteenth Amendment to the Federal Constitution. He also raises constitutional violations under Article I, section 9 and Article I, section 1 of the Iowa Constitution. The violations, he says, result because under the guardianship he is required to live in a restrictive environment without a determination that he is dangerous. In addition, he says, the guardianship statute violates his liberty interest because the statute does not require and there has been no showing that "he is unable to care for himself and will come to harm if the guardianship is terminated." Because the statute does not require such a showing, Curtis maintains the statute is unconstitutionally vague and overbroad.
Curtis is also convinced that constitutionally the burden of persuasion should be on the guardian to establish by clear and convincing evidence that the guardianship should continue. Curtis points out that there never was an initial determination that a guardianship was necessary because it was opened on a voluntary basis. So, he argues, the law can infringe on his liberty by way of guardianship only if its necessity is established by clear and convincing evidence.
Curtis maintains that the evidence is not clear and convincing that the guardianship should continue. So, he believes the guardianship should be terminated.
*575 Curtis has a fall back position: if the guardianship is to continue, then he feels that the guardian should be removed.
Because Curtis raises several constitutional issues, our review is de novo. State v. Lewis, 514 N.W.2d 63, 68 (Iowa 1994).
A. Violation of liberty interest: challenges under Fourteenth Amendment and Article I, section 9 and Article I, section 1 of the Iowa Constitution. The Fourteenth Amendment to the Federal Constitution prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. Article 1, section 9 of the Iowa Constitution similarly provides that "no person shall be deprived of life, liberty, or property, without due process of law." Iowa Const. art. I, § 9. Article 1, section 1 declares that "[a]ll men are, by nature, free and equal, and have certain inalienable rightsamong which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness." Iowa Const. art I, § 1. We usually deem the federal and state due process clauses to be "identical in scope, import, and purpose." Bruns v. State, 503 N.W.2d 607, 611 (Iowa 1993).
Curtis analogizes our guardianship law to involuntary civil commitment. For reasons discussed in division IV of this opinion, we agree they are indeed analogous. Guardianship involves such a significant loss of liberty that we now hold that the ward is entitled to the full panoply of procedural due process rights comparable to those present in involuntary civil commitment proceedings. We think that the stigma of incompetence provides further justification for invoking procedural due process guarantees in favor of the ward.
That brings us to the next issue.
B. Whether the guardianship statute is unconstitutional because it allows a guardianship to be established and maintained without a finding that the ward is unable to care for himself or herself without harm occurring: vagueness and overbreadth challenges. One of the grounds for employment of a guardianship for a proposed ward is that
[b]y reason of mental, physical or other incapacity [the proposed ward] is unable to make or carry out important decisions concerning the proposed ward's person or affairs, other than financial affairs.
Iowa Code § 633.552(2)(a). Curtis thinks this statute is unconstitutionally vague and overbroad because it lacks standards "restraining the discretion of adjudicators." He also thinks the statute (1) fails to give guidance about what "unable to make or carry out important decisions concerning the proposed ward's person or affairs" means and (2) covers people who can make decisions with the help of others. He insists that for those standards to pass constitutional muster, we must interpret them to mean that guardianship is necessary only if the ward is unable to care for himself or herself without harm occurring.
Iowa Code section 633.679 permits a person under guardianship to apply "to the court by petition, alleging that the person is no longer a proper subject thereof, and asking that the guardianship ... be terminated." Iowa Code § 633.679. Among the grounds for termination of the guardianship are:
3. A determination by the court that the ward is competent and capable of managing the ward's property and affairs, and that the continuance of the guardianship... would not be in the ward's best interests.
4. Upon a determination by the court that the ... guardianship is no longer necessary for any other reason.
Iowa Code §§ 633.675(3), (4). Curtis views Iowa Code section 633.675 as legislative recognition that a guardianship should not be continued unless it is necessary. To avoid constitutional problems of vagueness, Curtis argues that the quoted language in section 633.675 should be read to mean that the guardianship should be terminated unless it is necessary to avoid harm to the ward.
The Supreme Court has said that
a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or *576 leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.
Giaccio v. Pennsylvania, 382 U.S. 399, 402-03, 86 S.Ct. 518, 520-21, 15 L.Ed.2d 447, 450 (1966).
The Supreme Court has also said that
even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose.
Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960). This passage describes an unconstitutional overbreadth result. A shorthand expression for the same thing is that a statute is unconstitutionally overbroad if its reach "prohibits constitutionally protected conduct." Grayned v. City of Rockford, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972).
1. In re Boyer: vagueness and overbreadth challenges to Utah guardianship statute. Recently, a thirty-nine-year-old mildly mentally retarded person lodged a vagueness challenge against the Utah guardianship statute that has language similar to the Iowa statute. In re Boyer, 636 P.2d at 1086. The Utah statute dealing with the appointment of a guardian for incapacitated persons defines an "incapacitated person" as
any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person.

Id. at 1087 (emphasis added).
The Utah supreme court had this to say about the italicized words:
The statutory definition of an "incapacitated person" focuses on a person's "capacity to make or communicate responsible decisions concerning his person." The breadth and imprecision of that standard permit the determination of incompetency to be based on factors subjective to the trier of fact and factors extraneous to the legitimate interests of the state and the ward. That standard, standing alone, would allow a guardian to be appointed for a person who makes decisions regarded by some as irresponsible, even though he has sufficient capacity to make personal management decisions which allow him to function in a manner acceptable to himself and without any threat of injury to himself.
Id. at 1088 (citation omitted).
The court found another fault with the words "responsible decisions": "`responsible' focuses the [appointing] authority's attention on the content of the decision rather than on the ability of the individual to engage in a rational decision making process." Id. (citation omitted). Because the word "responsible" was not defined, the court believed the word "lends itself to a completely subjective and, therefore, potentially arbitrary and non-uniform, evaluation of what is decided rather than an objective evaluation of the method by which the decision is reached." Id.
The court concluded that the word "responsible" could have such a broad interpretation as to raise a serious question of unconstitutional vagueness. But the court wisely reasoned that the word could also be construed more narrowly so as to meet the statutory purpose while at the same time avoiding constitutional problems. Id. at 1089. Recognizing that it had a duty to adopt an interpretation that would save the guardianship statute, the court interpreted the statute this way:
We hold that under [the guardianship statute] a determination that an adult cannot make "responsible decisions concerning his person" and is therefore incompetent, may be made only if the putative ward's decision-making process is so impaired that he is unable to care for his personal safety or unable to attend to and provide for such necessities as food, shelter, clothing, and *577 medical care, without which physical injury or illness may occur.
Id.
The court viewed this definition of "responsible decisions" as accomplishing the "benign purposes of the statute ... without improperly trenching on" the individual's "liberties of self-determination, right of privacy, right to travel, [and] right to make one's own educational and medical decisions." Id. The court believed the definition provided specific, objective standards for determining the ability of one to care for one's own self, the only legitimate state interest in imposing guardianship on a person. Id.; see also In re Guardianship of Braaten, 502 N.W.2d at 518 (focusing on decision making capacity of proposed ward in holding that imposition of involuntary guardianship is justified only if proposed ward's recent or past behavior actually endangers the life, health, or personal support of proposed ward); In re Guardianship of Reyes, 152 Ariz. at 236, 731 P.2d at 131 (adopting Boyer construction of "responsible decisions"); Stephen J. Anderer, Determining Competency in Guardianship Proceedings, A.B.A. Pub.Serv. Monograph Series No. 1, at 27-36 (1990) [hereinafter Determining Competency] (focusing on decision making capacity of ward in advocating imposition of guardianship only if ward is wholly or partially functionally unable to care for self or properties; also advocating functional assessment on how well a proposed ward manages ward's task of daily living); Functional Evaluation, at 211-13 (advocating functional assessment of decision making capacity of a proposed ward to determine if guardianship is needed; functional assessment focuses on how well a proposed ward manages ward's task of daily living).
The ward in Boyer also challenged a statute specifying the powers of a guardian as overbroad because the statutory plenary powers are not necessary in specific cases. Id. at 1090. The Utah statute provided that "[a] guardian of an incapacitated person has the same powers, rights, and duties respecting his ward that a parent has respecting his unemancipated minor child ... except as modified by order of court...." Id. at 1091. The ward argued that the State must adopt the alternative least restrictive of the proposed ward's liberty. She attacked the Utah powers of guardian statute as sweeping too broadly because it allowed a guardian to have wide-ranging powers over the personal decisions of one who had limited, but not complete, need of supervision and assistance. Id. at 1090.
The court noted that the least restrictive alternative standard had been applied in involuntary civil commitment proceedings. That standard requires state officials to place involuntarily committed persons in settings that would be suitable or appropriate to their mental and physical conditions while least restrictive of their liberties. Id. Recognizing that appointment of a guardian may also result in a substantial loss of freedom for a proposed ward, the court opted for the following standard: in appointing the guardian, the court must consider the interest of the ward in retaining as broad a power of self-determination as is consistent with the reason for appointing the guardian of the person. Id. at 1090-91.
To carry out this standard, the court directed the appointing authority
to tailor the powers of a guardian to the specific needs of the ward. In appointing a guardian, the court should state with particularity the powers granted, unless the full scope of the statutory authorization is warranted. The process should be individualized and based upon careful consideration of the particular need for supervision.
To enable the court to fashion an appropriate remedy, the parties should submit evidence `... showing the proposed ward's inability to think or act for himself as to matters concerning his personal health, safety, and general welfare....' Based on this evidence, findings of fact should be made to support the powers conferred on the guardian, and those powers should be as clearly defined as the circumstances permit. So construed, the guardianship statute is not unconstitutionally overbroad.
Id. at 1091 (citation omitted); see also In re Guardianship of Braaten, 502 N.W.2d at 521 (least restrictive form of intervention codified by statute stating that "the guardianship imposed on the ward must compensate for only *578 those limitations necessary to provide the needed care and services, and ... the ward must enjoy the greatest amount of personal freedom and civil liberties consistent with the ward's mental and physical limitations."); Dicker, at 497 (noting that least restrictive alternative concept has been applied to civil commitments and advocating use of concept to guardianship proceedings because finding of incompetency affects fundamental constitutional rights) ("The application of the [least restrictive alternative] concept to guardianship proceedings requires an exploration of the specific interests to be protected and the specific needs and deficiencies of the alleged incompetent so that the methods utilized can achieve the desired protection with the least infringement on fundamental rights."); Determining Competency, at 36 (advocating the same); The Mentally Disabled, at 386 (advocating the same).
2. Constitutional vagueness analysis as to Iowa guardianship statutes. We think the framework of analysis employed in Boyer is appropriate for us to follow so that we, too, can insure that our guardianship law passes constitutional muster. Although Boyer involved a challenge to the appointment of a guardian, the analysis is still appropriate when, as here, there is a challenge to the continuation of a guardianship. The ward's condition in many cases is not static so it is appropriate to review and reduce the powers of a guardian, or even to terminate the guardianship, if the evidence supports such a decision. See Association for Retarded Citizens, 561 F.Supp. at 476 ("Mental retardation is defined as significantly below average intellectual functioning, existing concurrently with deficits in adaptive behavior, and manifested during the developmental period. For a person to be diagnosed as being mentally retarded, impairments in intellectual functioning must coexist with deficits in adaptive behavior.... Within the framework of the accepted definition of mental retardation, an individual may meet the criteria of mental retardation at one time in life and not at some other time."); see also Penry v. Lynaugh, 492 U.S. 302, 339-40, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256, 291-92 (1989) (holding that concept of "mental age" is unreliable because the concept "may underestimate the life experiences of retarded adults, while it may overestimate the ability of retarded adults to use logic and foresight to solve problems") (suggesting that mental age concept could have disempowering effect because "a mildly mentally retarded person could be denied the opportunity to enter into contracts or to marry by virtue of the fact that he had a `mental age' of a young child").
The language "unable to make or carry out important decisions concerning the proposed ward's person or affairs" in Iowa Code section 633.552(2)(a) (opening guardianship) is subject to the same criticism voiced in Boyer about the Utah guardianship statute. So, too, is the following italicized language in Iowa Code sections 633.675(3) and (4), the termination of guardianship provisions. See Iowa Code §§ 633.675(3) ("A determination by the court that the ward is competent and capable of managing the ward's property and affairs, and that the continuance of the guardianship ... would not be in the ward's best interests.") (emphasis added); and 663.675(4) ("Upon determination by the court that the ... guardianship is no longer necessary for any other reason.") (emphasis added).
The objectionable language emphasized in sections 633.552(2)(a), 633.675(3), and 633.675(4)standing aloneis too subjective. It is too subjective because it would allow a guardian to be appointed or a guardianship to continue for persons who have sufficient capacities to make decisions that allow such persons to function in ways acceptable to them and without any threat of harm to them. We think, too, that the language focuses the appointing authorities' attention on the content of the decision rather than on the capacity of the ward or proposed ward to engage in a rational decision making process. Because the language is so subjective, the potential is there for an "arbitrary and non-uniform [] evaluation of what is decided rather than an objective evaluation of the method by which the decision is reached." In re Boyer, 636 P.2d at 1088 (citation omitted).
To eliminate any constitutional vagueness problem, we think the test *579 adopted in Boyer is appropriate to apply on an application to (1) appoint a guardian, (2) modify a guardianship, or (3) terminate a guardianship. See Iowa Code §§ 633.552 (appointment of guardian); 633.635(4) (modification of guardianship); 633.675 (termination of guardianship). Hereafter, the district court may make a finding of incompetency under all three sections only if the court finds that the ward's or proposed ward's decision making capacity is so impaired that the ward is unable to care for his or her personal safety or unable to attend to or provide for such necessities as food, shelter, clothing, and medical care, without which physical injury or illness may occur. Under this incompetency test, evidence must be submitted showing that the ward or proposed ward is unable to think or act for himself or herself as to matters "concerning [the ward's] personal health, safety, and general welfare." In re Boyer, 636 P.2d at 1091. In addition, the district court's findings of fact based upon this evidence should support the powers conferred on the guardian. These powers should be articulated as clearly as each case permits. Id.
In making a determination as to whether a guardianship should be established, modified, or terminated, the court must consider the availability of third-party assistance to meet a ward's or proposed ward's need for such necessities, if credible evidence of such assistance is adduced from any source. However, neither party shall have the burden to produce such evidence. Compare O'Connor, 422 U.S. at 576, 95 S.Ct. at 2494, 45 L.Ed.2d at 407 ("[A] state cannot constitutionally confine without more a non-dangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."); In re Estate of Early, 35 Cal.3d 244, 254, 673 P.2d 209, 215, 197 Cal.Rptr. 539, 545 (1983) (holding that on issue of whether to impose conservatorship trier of fact "must consider the availability of third-party assistance to meet the basic needs of the proposed conservatee for food, clothing or shelter only if credible evidence of such assistance is adduced from any source at the trial of the issue"); In re Guardianship of Braaten, 502 N.W.2d at 521 (finding that available support services and arrangements were adequate alternative to general guardianship for mildly retarded thirty-nine-year-old woman; evidence supported limited guardianship only with least restrictive form of intervention consistent with the ward's capabilities for self care); Dicker, at 507 ("If specific needs actually exist, then an exploration of alternatives [to guardianship] to resolve the problem should be undertaken by interested family, friends, or governmental agencies."); The Mentally Disabled, at 391 ("One alternative to traditional guardianship is protective services ostensibly provided to incapacitated persons so that they may live safely and humanely in the community without more restrictive legal intervention. The clients who benefit from such services include elderly, mentally ill, and developmentally disabled persons."). Our conclusion compels us to overrule prior case law to the contrary. See, e.g., In re Conservatorship of Schrock, 211 N.W.2d 327, 329 (Iowa 1973) (termination of a voluntary conservatorship is properly denied where ward does not prove a capacity to manage his business affairs without guidance and assistance by others).
3. Constitutional overbreadth analysis as to Iowa guardianship statutes. The powers a court may confer upon a guardian are listed in Iowa Code section 633.635. We think the least restrictive standard is incorporated in Iowa Code sections 633.635(3) and (4), which provide:
3. The court may take into account all available information concerning the capabilities of the ward and any additional evaluation deemed necessary, and may direct that the guardian have only a specially limited responsibility for the ward. In that event, the court shall state those areas of responsibility which shall be supervised by the guardian and all others shall be retained by the ward.
4. From time to time, upon a proper showing, the court may alter the respective responsibilities of the guardian and the ward, after notice to the ward and an opportunity to be heard.
*580 Iowa Code §§ 633.635(3), (4) (emphasis added).
To insure that a ward's or proposed ward's procedural due process rights are protected, we direct the district court to make a determination in all casesoriginal application, application for modification, and application for terminationwhether limited guardianship as authorized in the above-stated sections is appropriate. In making that determination, the court shall make findings of fact to support the powers conferred upon the guardian. With these requirements, we think section 633.635 is not unconstitutionally overbroad. See In re Guardianship of Reyes, 152 Ariz. at 236, 731 P.2d at 131 (statute that permitted limited guardianship found not to be unconstitutionally overbroad); Uniform Guardianship and Protective Proceedings Act, 8A U.L.A. 440-41 (1993) (pointing out that limited guardianship grew out of recommendations of American Bar Association project, the ABA Commission on the Mentally Disabled, and noting that "[t]he call for `limited guardianship' was a call for more sensitive procedures and for appointments fashioned so that the authority of the protector would intrude only to the degree necessary on the liberties and prerogatives of the protected person").
C. Standard of proof and burden of persuasion. The last constitutional issue Curtis raises concerns the standard of proof and who should have the burden of persuasion in termination of guardianships. Curtis thinks due process requires the standard of proof should be "clear and convincing evidence." He also thinks that the guardian should have the burden of persuasion in termination proceedings.
Iowa Code section 633.675 governs termination of guardianships. The statute provides no guidance on the standard of proof and who should have the burden of persuasion. Case law does provide that the ward has the burden of persuasion in termination proceedings. In re Guardianship of Stark, 254 Iowa 598, 600, 118 N.W.2d 537, 538 (1962). Curtis properly points out that no constitutional question on this issue was raised in Stark.
1. Standard of proof. For the answer to this question, we again look to the analogous area of involuntary civil commitment. In Addington, 441 U.S. at 433, 99 S.Ct. at 1813, 60 L.Ed.2d at 335, the Supreme Court held that in civil commitment cases the standard of proof must be by clear and convincing evidence. Accord Stamus, 414 F.Supp. at 449; B.A.A., 421 N.W.2d at 126; Iowa Code § 229.13. The potential serious deprivation of liberty, the adverse social consequences, and the serious risk of error served as reasons for the Court's insistence upon this standard of proof. Addington, 441 U.S. at 425-26, 99 S.Ct. at 1809, 60 L.Ed.2d at 330-31.
In Boyer, the court used similar reasoning in concluding that clear and convincing evidence should be the standard of proof under Utah's guardianship law. In re Boyer, 636 P.2d at 1092. The court used a balancing test in determining which standard was appropriate, balancing the State's interest in having a guardian appointed, the interest of the proposed ward, and the consequences of an erroneous judgment and potential abuse, either wittingly or unwittingly, by third persons. Id. at 1091. Personal liberty, stigma, unwanted medical treatment, legal disabilities, and possible imposition by designing individuals were included in the proposed ward's interest. Protecting the proposed ward from injury to the ward's person constituted the State's interest. Id.
The Boyer court rejected the reasonable doubt standard, concluding it was too restrictive and would tend to frustrate the beneficial purposes of the statute by making a guardian unavailable to persons needing only a limited degree of supervision. It rejected the preponderance of evidence standard because that standard would provide inadequate protection to a ward's interests. The court believed the preponderance of evidence standard allowed too much doubt in the fact finder's mind as to the correctness of the decision. Id. The court was convinced that the clear and convincing evidence standard was the perfect middle ground because this standard minimized error as far as possible without undermining or frustrating the purposes served by the guardianship statute. *581 Id. at 1091-92; see also Dicker, at 495 (suggesting that Addington by implication may have decided that clear and convincing evidence standard was required in guardianship proceedings).
Because the liberty interest of the individual is at stake in civil commitment and guardianship proceedings, we think the clear and convincing evidence standard is the appropriate one to apply in guardianship proceedings, whether those proceedings involve appointment, applications to modify, or applications to terminate.
2. Burden of persuasion. Recently one appellate court squarely addressed the issue of who had the burden of persuasion in a proceeding to terminate guardianship. In re Sanders, 108 N.M. 434, 773 P.2d 1241 (N.M.Ct.App.1989). The court noted that proceedings to terminate guardianships differ from proceedings seeking the initial appointment of a guardian because presumably the need for such appointment has already been proven. This then gives rise to a presumption that the ward's prior condition continues to exist. The court reasoned that the wardthe party against whom there is a presumptionhas the burden of going forward to rebut or meet that presumption. But the burden of persuasion continues to rest upon the party upon whom it originally restedin this case the party who originally initiated the guardianship. Id. at 437-38, 773 P.2d at 1244-45.
We think this analysis is particularly appropriate here where the guardianship was voluntarily imposed with no contested hearing to determine the extent of Curtis' incompetency. We think a ward in these circumstances should make a prima facie showing that the ward has some decision making capacity. Once the ward has done this, the guardian has the burden to go forward to prove by clear and convincing evidence the ward's incompetency, if any. Throughout the proceedings (initial appointment of guardian, modification of guardianship, or termination), this burden of persuasion rests on the party petitioning for guardianship or on the guardian if a guardianship has been established. Earlier we stated the incompetency test: the ward's or proposed ward's decision making capacity is so impaired that the ward or proposed ward is unable to care for his or her personal safety, or unable to attend to or provide for such necessities as food, shelter, clothing, and medical care, without which physical injury or illness may occur. Our conclusion on who ultimately bears the burden of persuasion requires us to overrule prior case law to the contrary. See, e.g., In re Conservatorship of Schrock, 211 N.W.2d at 329 (holding that burden of persuasion in termination of guardianship proceeding is on ward).
D. Whether to terminate the guardianship. As mentioned, the district court did not have the benefit of this opinion. Consequently, it did not apply this incompetency test. In addition, although not expressly stated, we assume the court applied a preponderance of evidence standard rather than a clear and convincing evidence standard. And, as our prior cases have held, we assume the court put the burden of persuasion on the ward rather than on the guardian. For these reasons, we must reverse the district court's order that denied Curtis' petition to terminate the guardianship.
Iowa Code section 633.33 provides that
[a]ctions to set aside or contest wills, for the involuntary appointment of guardians and conservators, and for the establishment of contested claims shall be triable in probate as law actions, and all other matters triable in probate shall be tried by the probate court as a proceeding in equity.
Iowa Code § 633.33. A petition to terminate guardianship is not included in those actions triable in probate as law actions. So a petition to terminate a guardianship is triable as a proceeding in equity. Our review then is de novo. Iowa R.App.P. 4; see also In re Conservatorship of Schrock, 211 N.W.2d at 329; Suplee v. Stonebraker, 195 N.W.2d 678, 681 (Iowa 1972).
Ordinarily in a de novo review, we would find the facts anew and decide the case. In re Marriage of Bergfeld, 465 N.W.2d 865, 870-71 (Iowa 1991). But because of the new incompetency test and standard of proof and burden of persuasion requirements, we think *582 it would be appropriate to remand the case for any additional evidence the parties think may be necessary and relevant because of these changes. The district court would then be in a better position to determinein accordance with this opinionwhether the guardianship should be limited, how the guardianship should be limited, or whether there should be any guardianship at all. See id. at 871 (appellate court may remand an equity case for further proceedings when essential to effectuate justice).
That brings us to Curtis' final issue.
E. Removal of the guardian. Iowa Code section 633.65 governs removal of a guardian. It pertinently provides:
When any fiduciary is, or becomes, disqualified under section 633.63 [person is not qualified to serve as fiduciary if court determines person is unsuitable] and 633.64 [person may not be qualified to serve as fiduciary if person is a nonresident], has mismanaged the estate, failed to perform any duty imposed by law, or by any lawful order of court, or ceases to be a resident of the state, then the court may remove the fiduciary.
Iowa Code § 633.65 (Emphasis added.)
Curtis alleges that the guardian is disqualified for several reasons: (1) she has failed to file reports required by law; (2) she has failed to assure that he has been provided appropriate training and education as required by Iowa Code section 633.635(1)(a); and (3) she has ceased to be a resident of the state.
Our review as to the facts is de novo. See Iowa Code § 633.33 (action to remove fiduciary not included among actions cited as triable at law; such a proceeding is included in the catchall phrase "all other matters triable in probate shall be tried by the probate court as a proceeding in equity").
Because of the way we have interpreted the test for incompetency and now require the district court to consider limited guardianship in all cases, there may or may not be a need for guardianship. In addition, if the ward is found to be only partially incompetent and only a limited guardianship is required, the district court may determine that Curtis has the capacity to decide who his guardian should be. See Determining Competency, at 36 ("Where guardianship is the appropriate intervention, a limited guardianship should be preferred. The court should attempt to make an intervention that is in accord with the [ward's] values and ideals and should take into consideration the ward's expressed preferences regarding living arrangements, activities or guardian.").
This is especially important because of Curtis' allegations. These allegations raise the question whether there is such an irreconcilable conflict between the guardian and Curtis that the guardian may not be suitable in a limited guardianship context. If a plenary or full guardianship is justified in this case, we tend to find no abuse of discretion because of the district court's expressed reasons for not removing the guardian. But as we said, the district court may find that (1) a limited guardianship is justified, or (2) no guardianship at all is required. So we think it would be appropriate in these special circumstances to remand so that the district court may reconsider its decision on this issue in light of what we have said.

VI. Conclusion.

We summarize our holdings as follows. First, in proceedings to establish, modify, or terminate a guardianship, the district court may make a finding of incompetency only if the ward's or proposed ward's decision making capacity is so impaired that the ward is unable to care for his or her personal safety or to attend to and provide for such necessities as food, shelter, clothing, and medical care, without which physical injury or illness may occur. Credible evidence of third-party assistance produced from any source must be considered in this determination.
Second, in determining whether a guardianship is to be established, modified, or terminated, the district court must consider whether a limited guardianship is appropriate.
Third, in proceedings to establish, modify, or terminate a guardianship, the standard of proof for determining incompetency is clear and convincing evidence.
*583 Last, where the ward petitions to terminate the guardianship, the ward must make a prima facie showing that the ward has some decision making capacity. Once this prima facie showing is made, the guardian has the burden to go forward and prove by clear and convincing evidence the ward's incompetency, if any. This burden of persuasion is on the party petitioning for guardianship, and always remains with the guardian when the proceeding is one to modify or terminate the guardianship.
Almost twenty years ago, the Task Panel on Legal and Ethical Issues of the President's Commission on Mental Health gave, in part, the following recommendation on what it believed due process required in guardianship proceedings:
4. Guardianship.

Recommendation 1.
(a) State guardianship laws should be revised to provide (1) increased procedural protections including, but not limited to, written and oral notice, the right to be present at proceedings, appointment of counsel and a clear and convincing evidence standard as the burden of proof; a comprehensive evaluation of functional abilities conducted by trained personnel; and a judicial hearing which employs those procedural standards used in civil actions in the courts of general jurisdiction of any given State; (2) a definition of incompetency which is understandable, specific and relates to functional abilities of people; (3) the exercise of guardians' powers within the constraints of the right to least restrictive setting, with no change made in a person's physical environment without a very specific showing of need to remove a person to a more restrictive setting; and (4) a system of limited guardianships in which rights are removed and supervision provided only for those activities in which the person has demonstrated an incapacity to act independently.
(b) Public guardianship statutes should be reviewed for their effect in providing services to persons in need of but without guardianship.
Report of the Task Panel on Legal and Ethical Issues to the President's Commission on Mental Health, 20 Ariz.L.Rev. 49, 76 (1978). Our guardianship lawtogether with the way we have interpreted it in this opinion meets substantially all of this recommendation. In the way it treats mentally disabled persons, society has come full circle from the medieval concept of complete control to the humane modern use of the least restrictive alternative.
REVERSED AND REMANDED WITH DIRECTIONS.
All Justices concur except HARRIS and NEUMAN, JJ., who concur in the result.