**IN THE COURT OF APPEALS OF IOWA**

No. 22-0562
Filed March 8, 2023

**IN THE MATTER OF THE GUARDIANSHIP OF MACKENZIE JOHNSON,**

**CYNTHIA JOHNSON, Guardian,**
    Appellant,

_____

Appeal from the Iowa District Court for Marion County, Martha Mertz, Judge.

Cynthia Johnson appeals a district court order removing her as guardian of her adult daughter. **AFFIRMED.**

Bradley J. Adams, Knoxville, for appellant.

Scott Lyon of Disability Rights Iowa, Des Moines, for appellee.

Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

Up until the spring of 2021, Cynthia Johnson was a wonderful guardian for her adult daughter, Mackenzie. But then Cynthia suffered a series of mental-health crises, which led the district court to grant Mackenzie's request to remove Cynthia as her guardian and appoint a successor guardian. Because we find that Cynthia was no longer suitable as Mackenzie's guardian, we affirm the court's order.

## I.      Background Facts and Proceedings

Mackenzie Johnson suffers from an intellectual disability as a result of her premature birth. She was adopted by her grandmother, Cynthia Johnson, when she was about six years old,[1] although Cynthia has cared for her since birth. Mackenzie has also had a close relationship with the man she sees as her father, Dennis Ludwig, for all of her life.[2] When Mackenzie turned eighteen, she filed a voluntary petition to have Cynthia appointed as her guardian and conservator, which the district court granted in 2014.[3] *See* Iowa Code §§ 633.552(2)(a), .566(2)(a) (2014).

Mackenzie testified that Cynthia always provided for her as a child and into adulthood, but things changed when they went on a trip to Florida together in early 2021. During the trip, Cynthia learned that her boyfriend, Mike, fell in his garage back in Iowa. After learning of the fall, according to Mackenzie, Cynthia's behavior

---

[1] Some of the filings say the adoption occurred when Mackenzie was four, but Mackenzie testified she was six when the adoption occurred, and Cynthia testified she thought Mackenzie was seven.
[2] Dennis is not Mackenzie's biological or legal father, but he was in a relationship with Mackenzie's biological mother, and Mackenzie views him as her father. Dennis did not learn Mackenzie was not his biological child until she was six years old, but this discovery did not change their relationship.
[3] The conservatorship is not at issue in this appeal.

was "bad," and she was not acting "her normal way." Cynthia agreed with Mackenzie, testifying that when she found out about Mike's fall, she experienced "sheer panic" and put Mackenzie "through hell." Cynthia described Mike's fall as a "triggering incident" that "started all of these—this mental health treatment." These mental-health issues were new to Cynthia, who testified that before Mike's fall, she had probably only suffered from mild depression.

Once they returned to Iowa from their trip to Florida, Mackenzie testified that Cynthia continued to act "[n]ot good" and "not [like] herself anymore." Mackenzie said Cynthia was yelling at her more and leaving her by herself at places. In late June, Cynthia was hospitalized for her mental health. Cynthia agreed in her testimony that she was "hysterical" before her June hospitalization because she believed the police were looking for her, there were "cameras everywhere," and Amazon devices "listen to us." Cynthia was released from commitment after about five days, though she said it felt "like years, months."

Cynthia was committed again around the Fourth of July. According to Cynthia, this was a voluntary commitment following an incident where she called law enforcement because her neighbors were lighting fireworks. She testified that when she spoke to law enforcement officials that evening, she was "anxious and upset," which "was upsetting Mackenzie." Cynthia said she was so upset that the officials asked her if she "had a firearm in [her] home because they thought [she] was uncontrollable." Mackenzie stayed with Dennis while Cynthia was in the hospital.

After about three weeks of treatment, Cynthia was released into the care of her brother because, according to her testimony, "they wanted to make sure I had

someone watching me to make sure I was taking my medication." Cynthia went directly to Dennis's home with her brother and picked Mackenzie up. From there, they went to her brother's home in Tennessee. Mackenzie thought they were going to stay there "for good." But after about three days, Cynthia abruptly decided to leave while her brother and his wife were at work. At one point in her testimony, Cynthia said that her brother was threatening to have her committed unless she took her medication, but she felt that her medication was "fatal . . . because it was way too strong." Later on, however, Cynthia testified that she left because she needed to pay her bills. Whatever the reason, Cynthia described their departure as follows:

> So while they were at work, I told Mackenzie, "We need to pack our bags and we need to get out of here as quick as possible and get back to Knoxville so I can pay bills and I can get to the [mental health facility] and get my reduced dosage medication."

Mackenzie testified that she was scared when they left Tennessee because Cynthia was acting "[c]razy" and "using the back roads and everything and scaring me." On the two-day drive back to Iowa, Mackenzie said that Cynthia was again "[n]ot good," "[n]ot herself," and yelling at her. Cynthia testified that she knew Mackenzie was scared, but she "tried to make the trip fun." She did not, however, let Mackenzie use her cell phone on the trip back because "we could not be found until we got home." When they got back to Iowa, Cynthia asked one of her friends if Mackenzie could live with her, but the friend declined.

The yelling outbursts continued and, eventually, one of the neighbors called the police. Mackenzie said that when the police came, she "was crying and the

cops took Grandma." Cynthia was hospitalized for a third time, and Mackenzie went back to Dennis's home, where she has since remained.[4]

Since Mackenzie has been in his care, Dennis has set up services to help her develop independence and taken her to regular medical appointments. He has also encouraged Mackenzie to continue a relationship with Cynthia, who he testified has "always been wonderful for her." But Mackenzie testified she is scared of Cynthia and going back to live with her would be "[b]ad" and "[n]ot good," while living with Dennis is "[a]wesome" and "loving."

While Cynthia was still under a court committal in August 2021, the Iowa Department of Health and Human Services petitioned for the emergency appointment of a substitute guardian. *See generally* Iowa Code § 633.569 (2021). The petition alleged that Cynthia was committed three times "due to serious mental impairment" and requested that Dennis be appointed as Mackenzie's substitute guardian. Attached to the petition was an application for a temporary guardianship—signed by both Mackenzie and Dennis—alleging Mackenzie does not feel safe with Cynthia due to her behaviors. The court entered an emergency order appointing Dennis as Mackenzie's temporary guardian, temporarily removing Cynthia as guardian, and setting the matter for hearing.

In September, a periodic report under Iowa Code section 229.15 was filed in the commitment proceeding, in which a medical professional concluded Cynthia

---

[4] Cynthia testified that she allowed Mackenzie to stay with Dennis after her status as guardian was restored because, around the time when they went to Florida in 2021, her home flooded and it was still being repaired. While her appellate brief identified this as one of the "traumatic and unpredictable events that led to her mental-health issues," Cynthia did not testify that it affected her mental health.

no longer needed involuntary treatment for her bipolar diagnosis.  As a result, the court entered an order for discharge and termination of the commitment.  However, the order "urged" Cynthia "to voluntarily continue with treatment as recommended by . . . her physician."  Cynthia testified she has voluntarily continued mental-health treatment by seeing a "social worker/therapist about every two weeks" and virtually visiting with a physician "for medication updates."  Yet she also testified: "I would like to stop.  I think I'm strong and done."

In October, before the guardianship hearing was held, the department filed a notice with the court, stating Cynthia's "committals have now been dismissed," it "knows of no reason that Cynthia . . . cannot continue to act as guardian for Mackenzie," and it "no longer has legal grounds to alter the guardianship."  In response, the court entered an order canceling the upcoming hearing and restoring Cynthia as guardian.  The order directed that if Mackenzie or Dennis desired a change of guardian, then they would need to file an application seeking the same.

In November, Mackenzie (through counsel) filed a "motion to appoint successor guardian," which sought removal of Cynthia as guardian and appointment of Dennis as successor.  The motion alleged "Cynthia is still experiencing health issues that interfere with her ability to act effectively as Mackenzie's guardian," Mackenzie does not feel safe with Cynthia, and she wanted to keep living with Dennis.  The court appointed a court visitor, *see* Iowa Code § 633.562, who filed a report detailing his investigation and recommending that Dennis be appointed as Mackenzie's guardian.

A hearing was held in February 2022.  At its conclusion, the court ruled from the bench that Cynthia would be removed as guardian and Dennis appointed as

successor guardian. The court also directed Dennis to "continue to encourage the relationship between Mackenzie and" Cynthia, which he pledged to do. The court memorialized its decision in a brief written order. Cynthia appeals.

## II. Standard of Review

The parties disagree on the proper standard of review, with Cynthia arguing for correction of legal error and Mackenzie arguing for a de novo review. As our supreme court explained in *In re Guardianship of Hedin*, 528 N.W.2d 567, 581 (Iowa 1995), because a "petition to terminate a guardianship is not included in those triable in probate as law actions" in Iowa Code section 633.33,[5] it "is triable as a proceeding in equity." Our review is accordingly de novo. *Hedin*, 528 N.W.2d at 581. Yet in conducting this de novo review, we recognize "that the removal of [a] guardian rests in the sound discretion of the court and we will not interfere, where there is some basis for the order." *In re Guardianship of Cannon*, 1 N.W.2d 217, 220 (Iowa 1941). We also "give weight to the fact findings of the district court, especially concerning the credibility of witnesses, but are not bound by those findings." *In re Guardianship of Seymour*, No. 09-1484, 2010 WL 4967989, at *1 (Iowa Ct. App. Dec. 8, 2010).

## III. Analysis

In claiming the district court should not have removed her as guardian, Cynthia largely highlights her suitable performance as caregiver for Mackenzie

---

[5] Section 633.33 provides: "Actions to set aside or contest wills, for the *involuntary appointment of guardians and conservators*, and for the establishment of contested claims shall be triable in probate as law actions, and all other matters triable in probate shall be tried by the probate court as a proceeding in equity." (Emphasis added.)

before her mental-health issues arose and her participation in treatment with no recurring episodes since those issues surfaced in mid-2021. Against that backdrop, Cynthia argues that she should not have been removed as Mackenzie's guardian because there was no "extreme dereliction" of her duties as guardian and her "short-term mental health problems" do not make her unsuitable.

### A.    Preliminary Removal Framework

"While the district court has great discretion in the removal of guardians, there must be some cause for removal." *In re Guardianship of Nobiling*, No. 14-1847, 2016 WL 757410, at *3 (Iowa Ct. App. Feb. 24, 2016). Iowa Code section 633.3(19) defines "fiduciary" to include a guardian, and section 633.65 provides for removal of a fiduciary as follows:

> When any fiduciary is, or becomes, disqualified under sections 633.63 and 633.64, has mismanaged the estate, failed to perform any duty imposed by law, or by any lawful order of court, or ceases to be a resident of the state, then the court may remove the fiduciary.

Section 633.63(1) governs qualification of resident fiduciaries who are natural persons of full age and expressly disqualifies a person who is "incompetent"[6] or a person "whom the court determines to be unsuitable."

### B.    Unsuitability

As noted, Cynthia submits the court had no basis to remove her as "unsuitable." The probate code does not provide any guidance on what renders someone unsuitable to serve as a fiduciary. *See In re Est. of Ragan*, 541 N.W.2d

---

[6] The term "incompetent" is defined in Iowa Code section 633.3(25). There is no indication this district court relied on this ground in removing Cynthia, and Mackenzie does not argue this ground applies.

859, 861 (Iowa 1995). In that void, our supreme court adopted the following standard in *Ragan*:

> The statutory word "unsuitable" gives wide discretion to a probate judge. Past maladministration of a comparable trust . . . warrants a finding that an executor or administrator is unsuitable. Such a finding may also be based upon the existence of an interest in conflict with his duty, or a mental attitude towards his duty or towards some person interested in the estate that creates reasonable doubt whether the executor or administrator will act honorably, intelligently, efficiently, promptly, fairly and dispassionately in his trust. It may also be based upon any other ground for believing that his continuance in office will be likely to render the execution of the will or the administration of the estate difficult, ineffective or unduly protracted. Actual dereliction in duty need not be shown.

*Id.* (quoting *Quincy Tr. Co. v. Taylor*, 57 N.E.2d 573, 574 (Mass. 1944)).

Our court applied this standard in *Nobiling* where, like here, we considered the removal of a mother as guardian for her adult child. *See* 2016 WL 757410, at *5. But because we highlighted the phrase—"a mental attitude towards his [or her] duty or towards some person interested in the estate that creates *reasonable doubt whether the [fiduciary] will act honorably, intelligently, efficiently, promptly, fairly and dispassionately*"—Cynthia argues the rest of the *Ragan* standard does not apply when determining whether a guardian should be removed as unsuitable. *See id.* (quoting *Ragan*, 541 N.W.2d at 861). Instead, according to Cynthia, there must be a finding of "extreme dereliction" of duties. We see no reason to limit the court's "wide discretion" in such a way. *Ragan*, 541 N.W.2d at 861.

In any event, Cynthia's "mental attitude" does create a reasonable doubt that she will act "honorably, intelligently, efficiently, promptly, fairly and dispassionately." Cynthia exercised extremely poor judgment during the months when she was suffering from her mental-health crises. *See Nobiling*, 2016

WL 757410, at *5 (finding the guardian's belief that her son, who sexually abused one of his siblings, was a suitable choice as successor guardian showed her "poor judgment" as guardian). Her behavior resulted in multiple interventions from law enforcement, three committals and hospitalizations, a furtive trip home from Tennessee, and disruptions to Mackenzie's home life. It also caused Mackenzie to fear Cynthia, lose trust in her, and not want to live with her. Cynthia admitted as much in her testimony.

This is the state of affairs even if Cynthia has addressed her mental health—an assertion we question. Cynthia's testimony at the hearing was rambling, confusing, and disjointed, with occasional outbursts. While she said that she would continue with her mental-health treatment, she also testified: "I would like to stop. I think I'm strong and done." And she had a gap in treatment after her committal ended, with no therapy sessions from the beginning of December 2021 until the week before the hearing and a missed medication-management appointment in January 2022. So we are skeptical of her claim that her mental-health issues were "short-term," as the district court implicitly found as well. *See Seymour*, 2010 WL 4967989, at *2 (deferring to the trial court's factual findings in recognition of its "ability to observe the witnesses while they were testifying and thus better judge their credibility").

At this point, the relationship between Cynthia and Mackenzie is afflicted by an inability to communicate and a lack of trust. As guardian, Cynthia may make various decisions for Mackenzie without prior court approval, including her residency. *See* Iowa Code § 633.635(2). But Mackenzie does not trust Cynthia or her judgment, she fears her, and she does not want to live with her. Despite

being aware of Mackenzie's feelings, Cynthia testified that she would require Mackenzie to return to live with her. While Mackenzie is intellectually disabled, she is high functioning and has some level of independence, as shown by her resistance in communicating with Cynthia.

In our view, the status of the relationship between Mackenzie and Cynthia would also render the guardianship "difficult, ineffective or unduly protracted" if Cynthia were to remain as Mackenzie's guardian. *Cf. In re Est. of Denzler*, No. 09-0665, 2009 WL 5126351, at *2 (Iowa Ct. App. Dec. 30, 2009) (finding no abuse of discretion in district court's disqualification of executor as unsuitable based on inability to communicate with beneficiaries and lack of "trust and confidence necessary for the discharge of his duties as executor"); *Est. of Randeris v. Randeris*, 523 N.W.2d 600, 606 (Iowa Ct. App. 1994) (affirming removal of fiduciary based on, among other things, lack of trust and confidence).

For these reasons, we reject Cynthia's claim that there was no basis in the record for her removal as unsuitable and affirm the district court's decision on this basis.[7]

**AFFIRMED.**

---

[7] The court did not specifically remove Cynthia on this, or any other, ground. But Cynthia does not complain about the court's specificity; she only complains there was no basis in the record to support removal for unsuitability, failure to perform legal obligations, or acting contrary to MacKenzie's best interests. *See In re Marriage of Mills*, 983 N.W.2d 61, 67 (Iowa 2022) (limiting scope of review to adjudicating rights anew "on the issues properly presented"). We have not addressed these last two grounds due to our conclusion that Cynthia was properly removed on the ground of unsuitability.