## IN THE COURT OF APPEALS OF IOWA

No. 15-0898
Filed March 23, 2016

IN THE MATTER OF THE GUARDIANSHIP OF
H.M.S,
    A Minor Child,

**JARROD SWALLOW,**
    Appellant,

**NATHAN AND MICHELLE BAUGHAN,**
    Guardians-Appellees.
_____

Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, Judge.

Jarrod Swallow appeals the district court's decision denying his petition to terminate the guardianship of H.M.S. **AFFIRMED.**

Steven Gardner and Nicole L. Greenwood of Denefe, Gardner & Zingg, P.C., Ottumwa, for appellant.

David G. Thinnes and Martha L. Quint of Thinnes & Quint Law Offices, Cedar Rapids, for appellees.

Heard by Danilson, C.J., and Vogel and Potterfield, JJ.

**VOGEL, Judge.**

Jarrod Swallow appeals the district court's decision denying his petition to terminate the guardianship of H.M.S. As the biological father, Swallow argues he established a prima facie case for custody and the guardians did not rebut the parental preference by showing he was unfit or had forfeited his right to custody. We conclude the guardians have overcome the parental presumption by establishing it is not in the child's best interests that the guardianship be terminated at this time. Consequently, we affirm the order of the district court denying Swallow's petition to terminate guardianship.

**I. Factual and Procedural Background**

H.M.S. was born in September 2011, when Swallow—the biological father—and Mackenzie Stewart—the biological mother—were eighteen years old. Due to the immaturity of both parents, Stewart brought H.M.S. to live with her maternal uncle and aunt, Nathan and Michele Baughan, in October 2012. An order appointing the Baughans as emergency, temporary guardians was entered on November 20, 2012.

On May 22, 2013, Swallow and Stewart entered into a stipulation with the temporary guardians stating that, should a guardianship be ordered, certain rights and obligations of the parties would prevail. Specifically, the stipulation provided for a visitation schedule in which Swallow and Stewart would each have, at a minimum, one weekend every month of supervised visitation with H.M.S., though it was later adjusted and the supervision requirement was removed. The stipulation also included that no child support would be paid and the guardians would provide health insurance. A guardianship was then

approved, and an order entered on May 22, 2013, appointing the Baughans as H.M.S.'s guardians.

The need for the guardianship arose not only because of the immaturity of the parents, but also because of their very unstable and strained relationship both prior to and after H.M.S.'s birth. Stewart testified to several incidences of abuse perpetrated on her by Swallow, describing the relationship as "very volatile, very abusive." In one incident in June 2012, Swallow kicked in the bathroom door after Stewart had locked herself in the room while attempting to escape from him. Swallow's step-mother admitted Swallow broke the door. Dragging Stewart out by her hair, Swallow then threatened Stewart with his hunting rifle, stating if that she broke up with him he would kill her and himself. All of this occurred while Stewart was holding H.M.S. in her arms. In an earlier incident, Swallow punched Stewart several times, leaving visible bruising on Stewart. Stewart's father testified he saw bite marks, bruises, rug burns, and scratches on Stewart's neck following one of Swallow's attacks. Stewart also testified about an incident when Swallow threatened to throw H.M.S. off the apartment balcony.

After the most recent incident, Swallow was charged with domestic abuse assault and child endangerment. On January 3, 2013, he pled guilty to the lesser charge of harassment in the second degree, for which he received a deferred judgment, and he completed a batterer's education program. A five-year no-contact order was entered in favor of Stewart and H.M.S., though following the plea the no-contact order between Swallow and H.M.S. was lifted. At the

guardianship hearing, the district court found Swallow's denial of any physical abuse not credible.

Currently, Swallow works fifty hours each week at John Deere in Ottumwa, earning $21.60 an hour along with benefits, including health insurance. He is purchasing the house in which he lives on contract. The residence is suitable for H.M.S., who has his own room. Ashley Sheedy, age twenty, is Swallow's live-in paramour.[1] They have been together for approximately three years, as Swallow was seeing Sheedy prior to Swallow and Stewart's final separation. Swallow stated he would rely on Sheedy to provide child care while he was working at night, though if they ended their relationship he would rely on family members. They both claim that their relationship is stable and non-abusive, but the district court did not find their assertions credible. Additionally, Stewart testified she saw messages on Facebook indicating the two were fighting, and that their relationship was unstable.

In H.M.S.'s current placement with the Baughans, all parties agree he is thriving. When he was first placed with the guardians, he was diagnosed with speech delays, and he was enrolled in speech therapy, which was successful. He is now developmentally on track, as well as physically healthy. However, Michele Baughan and the guardian ad litem (GAL) noted H.M.S. has anxiety issues and does poorly when his routine is interrupted. He is enrolled in an in-

---

[1] Sheedy is currently employed at Aspen Dental and was fired from her previous job at a bank. Though she denies the allegations, testimony at trial indicated she was viewing the Baughans' account information illegally and was therefore terminated. Stewart also alleged Sheedy began altercations with her, hacked her Facebook account, and posted personal and private information on social media accounts, including things about H.M.S.

home daycare several houses down from the Baughan residence. Both guardians are employed and financially provide for all of H.M.S.'s physical, emotional, and financial needs. Additionally, Michele works from home and is therefore able to accommodate H.M.S.'s schedule and needs as they arise. The Baughans have two other children whom H.M.S. views and interacts with as his siblings.

Stewart's extended family often visits the Baughan residence, giving H.M.S. a great deal of contact with other family members. In addition, Stewart often stays overnight at the Baughan home, H.M.S. recognizes she is his mother, and the two share a close bond. Although the guardians have encouraged contact and bonding between H.M.S. and both parents, Swallow has consistently and persistently declined the guardians' invitation to visit or have contact with H.M.S. outside of his scheduled monthly visits. The guardians characterize Swallow's visits with H.M.S. as "grab and go," despite their openness, willingness, and frequent attempts to work with Swallow. They believe it is in H.M.S.'s best interests to share information with both parents, but Swallow has repeatedly rebuffed their efforts to do so. To that end, Swallow had not spoken with the guardians for approximately one year prior to trial, communicating only with text messages as to visitation times. He never inquired as to H.M.S.'s daily routines or general well-being, including doctor visits, daycare, preschool, church, eating, or any developmental milestones. Furthermore, although the original stipulation provided he was not required to pay child support, he now has a good-paying job but has not offered to contribute any financial support for H.M.S.

Given these circumstances, the GAL recommended the guardianship remain in place. Stewart testified she would prefer that outcome as well, and the guardians stated they would remain H.M.S.'s primary caretakers as long as needed.

On October 6, 2014, Swallow filed a petition to terminate the guardianship, alleging the guardianship was no longer needed and should be terminated. With regard to the filing of the petition, the district court found:

> [Swallow] became upset because of his perception that [Stewart] got to see H.M.S. more frequently than he and his family. The Baughans are [Stewart's] maternal aunt and uncle. As a result, when there are large family gatherings for [Stewart's] family, H.M.S. is in attendance with them and [Stewart] gets to see him. [Swallow] took exception to this occurring and filed a petition to terminate the guardianship . . . .

A hearing on the matter was held on May 5, 2015, during which Swallow, the guardians, Stewart, Stewart's father (Michael Stewart), the GAL, Sheedy, and Swallow's step-mother (Melissa Swallow) testified. On May 7, 2015, the district court found Swallow's parental presumption had been "erased." In a detailed recitation of the evidence, the court found "strong indicators that [Swallow] is still prone to abuse, at least verbal and emotional," has "taken an extended holiday from the responsibilities of parenthood," "has done nothing to educate himself or keep himself abreast of H.M.S.'s health, education, or activities," and "has provided no financial support." The court also viewed the 2013 stipulation as not being intended for the creation of merely a temporary guardianship. The court then found the best interests of H.M.S. would be met by continuing the guardianship—at least for the present time—and therefore denied Swallow's petition. Swallow appeals.

**II. Standard of Review**

We review guardianship proceedings de novo. *In re Guardianship of Knell*, 537 N.W.2d 778, 780 (Iowa 1995). Our primary consideration is the best interest of the child. *In re Guardianship of M.D.*, 797 N.W.2d 121, 127 (Iowa Ct. App. 2011). We give weight to the trial court's factual findings, especially on matters of witness credibility, but we are not bound by them. *In re Guardianship of Stewart*, 369 N.W.2d 820, 822 (Iowa 1985).

**III. Burden of Proof**

The parties dispute the burden of proof incumbent on each party; consequently, we will address this issue first.

This appeal arises from the district court's denial of Swallow's petition to terminate the guardianship. When a petition to terminate is filed, the petitioner must show the guardianship is no longer necessary. *See* Iowa Code § 633.675 (2013) (noting the district court may terminate the guardianship if it "is no longer necessary for any . . . reason"). When a previously-established guardianship is by consent and the natural parent is the petitioner, the guardians then have the burden of rebutting the parental presumption found in Iowa Code section 633.559. *See Stewart*, 369 N.W.2d at 823 (noting the father "did not relinquish his presumptive right to custody when he agreed that the [guardians] should be appointed as guardians for" the child).

The parental presumption is set forth in Iowa Code section 633.559, which states that in opening a guardianship, the parents, "if qualified and suitable, shall be preferred over all others for appointment as guardian." In a petition to terminate a guardianship, this presumption can be rebutted by establishing that it

is in the child's best interests that the guardianship continue. *See Knell*, 537 N.W.2d at 781 (noting the current guardian "bears the burden of proof of rebutting the presumption favoring the natural parent by establishing that [the child's] best interest requires that she continue in [the guardian's] care"); *see also Stewart*, 369 N.W.2d at 824 (noting the district court properly placed the burden of proof on the guardians to rebut the parental presumption by showing it is in the child's best interests the guardianship continue); *Carrere v. Prunty*, 133 N.W.2d 692, 696 (Iowa 1965) ("[Statutes] giving preference to parents in custody cases do not provide for an absolute right in the parent but only a presumptive right which must give way where it has been relinquished or where the welfare and best interest of the child call for other custody.").

Pursuant to our case law, Swallow retains the parental presumption because this was a guardianship by consent, and therefore, the adequacy of his parenting was never examined by a court. *See Stewart*, 369 N.W.2d at 822. Subsequently, it is the guardians' burden to rebut the presumption by showing it is in the child's best interests that the guardianship be continued.[2] *See Knell*, 537 N.W.2d at 781.

---

[2] Contrary to Swallow's argument, we find no support in our case law that a "present risk" to the child must be proven before the parental presumption can be rebutted. However, we note it has been a consideration in some related custody determinations. *See, e.g.*, *Northland v. Starr*, 581 N.W.2d 210, 213 (Iowa 1998) (holding the guardian failed to rebut the presumption because he did not establish it was in the child's best interests that the guardianship should not end, partly because he did not show any present danger posed by the father to the child); *In re Mann*, 293 N.W.2d 185, 190 (Iowa 1980) (noting: "Parents are not to be denied custody for past indiscretions which do not demonstrate a present risk").

**IV. Termination of Guardianship**

Swallow argues the guardians failed to meet their burden rebutting the parental presumption so the guardianship should be terminated. He asserts that as the biological father he is presumptively the best caretaker, particularly given he is steadily employed, has not had a reported incidence of violence in the past three years, and is purchasing a home on contract.[3]

Though the parental presumption requires the court to favor the natural parent, it can be rebutted if "the conditions are such, as to render it essential to the safety and welfare of the child in some serious and important respect, either physically, intellectually, or morally, that [the child] should" not be in the care of the parent. *M.D.*, 797 N.W.2d at 127; *see also Knell*, 537 N.W.2d at 782 (noting that, for the parental presumption to be rebutted, there must be evidence that placement with the natural parent "is likely to have a seriously disrupting and disturbing effect upon the child's development"). It is also incumbent upon the guardians to show by clear and convincing evidence that it is in the child's best interest to remain in their care, which they can do by establishing the child is thriving and would be detrimentally affected if his living situation changed. *See In re Guardianship of Roach*, 778 N.W.2d 212, 215 (Iowa Ct. App. 2009); *see also*

---

[3] If the guardianship were terminated, a separate petition would need to be filed as between Swallow and Stewart to determine, among other things, legal custody, physical care, visitation, and child support. *See generally* Iowa Code § 598.41; *see also id.* § 600B.40. As the district court noted:

> [Swallow] has opted to attempt to have the guardianship ended without simultaneously or first filing an action seeking custody of H.M.S. If the court terminates this proceeding, there will be no custody, support, or visitation orders in place. To partially address this problem, [Swallow] has asked that the court terminate this proceeding, but name him as the guardian of H.M.S. In effect, he attempts to use his motion in this guardianship proceeding to get around the normal procedures under Iowa Code chapter 598 for determination of custody and support.

*In re Guardianship of Hedin*, 528 N.W.2d 567, 580–81 (Iowa 1995) (noting the guardians bear the burden to show by clear and convincing evidence the guardianship should not be terminated).

Upon our de novo review, we conclude the parental presumption has been overcome, and it is in H.M.S.'s best interests that the guardianship continue. As the district court noted:

> H.M.S. is now a well-adjusted, happy, thriving child. He relates well with the Baughans' two daughters and likely views them more as sisters. He loves their family routine. He has a consistent daycare provider within a short walk of his home, goes to Sunday School (when not visiting his parents), and is enrolled in preschool. He lives in a wonderful home and neighborhood and has many other children with whom to build relationships. Michele works from home. This gives her the flexibility to drop H.M.S. at daycare and pick him up on a schedule that works best for him. It also allows her to be his caregiver if he is sick or otherwise unable to go to daycare.
>
> H.M.S. also has positive relationships with both of his parents because the Baughans do all they can to build those bonds and to encourage those relationships. [Stewart] actually spends some of her weekends staying at the Baughans' home. This allows H.M.S. to visit his mom while still being at home. The Baughans have been accommodating of requests by [Swallow] for additional visitation time except when those requests have been made too late in time and conflict with existing plans that would include H.M.S. The court finds Nathan Baughan's testimony that he highly values H.M.S.'s ability to build a meaningful relationship with Swallow as particularly credible. It is also clear from the evidence that the Baughans, while treating H.M.S. as if he was their own son and sparing no effort or expense to give him an excellent childhood, are intent on making sure he forms positive, lasting bonds with both of his parents.

The record supports the district court's summation, and we agree that H.M.S. is currently thriving in the care of the guardians. He is comfortable in his current placement, developmentally on track, well cared for, and is in a routine that works for him. He has regular contact with extended family and has well-

established friendships. Michele also noted that H.M.S. becomes easily upset if his routine is disrupted or if he is in unfamiliar surroundings. Thus, we agree with the district court's findings that terminating the guardianship would not be in H.M.S.'s best interests. *See Knell*, 537 N.W.2d at 781–82.

Of particular import is the guardians' encouragement that H.M.S. have a relationship with both parents, and as a result, Stewart is very involved in H.M.S.'s life and sees him regularly. While the guardians have encouraged Swallow to be more involved in H.M.S.'s daily life, their efforts have been rejected, which does not bode well in promoting H.M.S.'s best interests. Swallow only sees H.M.S. one weekend each month, and he does not visit, call, or otherwise contact H.M.S. or the guardians at any other time. He does not inquire about the activities in which H.M.S. is involved, visit his preschool, ask about medical care, or know anything regarding H.M.S.'s daily routine. Additionally, Stewart testified that when she and Swallow lived together, she was H.M.S.'s primary caretaker, with little involvement or support from Swallow.

Swallow testified that should the guardianship be terminated, he intends to have his girlfriend be H.M.S.'s primary caregiver. Of great concern to the district court, and to us, was the evidence that Swallow made threats of causing H.M.S. serious harm during his physical abuse of Stewart. The district court found Swallow "still reflects immaturity in ways that are critical to the outcome of this case." When considering how Swallow would manage if he were, at this point, to be a full-time parent, the district court found:

> The only credible evidence the court has indicates that in such a situation, [Swallow] is still volatile and prone to anger. There are indications that [Swallow] may now have greater control of his

temper, but so little time has passed since the original incidents of abuse that the Court finds abusive behavior is still likely to occur if [Swallow] is placed under sufficient stress. [Swallow's] continued denials that he has engaged in such behavior are not credible. The fact that he attempts to deny or hide this behavior only heightens the court's concern that [Swallow] is not a fit parent.

Moreover, though Swallow uses his financial stability as a reason to terminate the guardianship, he has not offered to begin any financial support of H.M.S. Consequently, it was evident to the district court Swallow is not an involved or supportive father, which weighs against the parental presumption. *See Stewart*, 369 N.W.2d at 823 (noting "a parent who has taken an extended holiday from the responsibilities of parenthood may not take advantage of the parental preference"). Additionally, H.M.S. has bonded to the Baughans and their children, and he has a dependable, stable routine. Because of the Baughans' attention to H.M.S.'s needs, they have continued to encourage the development of a good relationship with both parents. The district court found Swallow and Stewart "demonstrated zero ability to effectively communicate during the period they cohabitated" and further determined the termination of the guardianship would upset the delicate balance of the parental relationships H.M.S. now enjoys.

In deference to the district court's extensive credibility findings, we note in particular the court's "heightened concern" as to Swallow's "attempts to deny or hide" his anger issues and past abuse of Stewart. *See Tim O'Neil Chevrolet v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) (noting the appellate court gives weight to the district court's findings of fact, particularly with regard to the credibility of witnesses, as the court was there to witness first-hand their

demeanor). The court found "too little time had passed to convince the court that [Swallow] had changed his ways and would no longer be abusive if placed under the stress of caring for H.M.S. full time." However, the court also "envision[ed] a point in time in the foreseeable future when termination of this guardianship may be appropriate," suggesting more visitation with both parents and encouraging all parties to "redouble their efforts to communicate regarding H.M.S."

On our de novo review of the evidence, we agree with the district court that the guardians have successfully rebutted the parental presumption favoring Swallow, as it is in H.M.S.'s best interests that—at least for the present time—the guardianship remain intact. *See Knell*, 537 N.W.2d at 781–82; *see also Roach*, 778 N.W.2d at 214–15 (holding that, given the guardians demonstrated the mother was not involved in the child's life except for some weekend visits, in addition to the mother's other issues, the guardianship should not be terminated). Therefore, we affirm the order of the district court denying Swallow's petition to terminate the guardianship of H.M.S.

**AFFIRMED.**