IN RE GUARDIANSHIP OF WILKIE J. HUSMANN.

BERTHA HUSMANN, guardian, appellant, v. GEORGE O. GREENWAY, successor guardian, et al., appellees.

No. 48302.

(Reported in 64 N.W.2d 252)

832

MAY 4, 1954.

Rhinehart & McLaughlin, of Anamosa, and Elliott, Shuttleworth & Ingersoll, of Cedar Rapids, for appellant.

Donald J. Dolphin, of Manchester, and A. H. Christiansen, of Des Moines, for appellees.

THOMPSON, J.—On November 24, 1942, the district court

of Delaware County appointed the appellant as guardian of the property of her husband, Wilkie J. Husmann, an incompetent. On December 2, 1942, she was authorized to continue the farming business in which her husband had been engaged, and to use funds for the support of the family, by the following order: "* * * the guardian * * * is therefore authorized to carry on the farming enterprise in the same or similar manner as it has been carried on by the ward and she is further authorized to use the funds of the guardianship to provide necessities for the family of the ward and her use of the funds in providing said necessities shall be limited to providing such necessities only as it has been their custom to have and as are reasonably necessary to provide the necessities of life for herself and family."

The ward and his family were tenant farmers, and had been engaged in farming for many years past. The family consisted of the husband and wife and ten children, eight of the latter being still at home. The record shows that these eight children lived with the appellant during the entire period of the guardianship, with the exception of one son who was absent for a few months immediately before the termination of the appellant's authority. The seven youngest children ranged in age from five to fourteen years at the time of appellant's appointment. The children had no property of their own, and appellant in her individual capacity nothing except a one-half interest, amounting to slightly over $1500, in a real-estate note and mortgage, and the household furniture and furnishings.

Appellant did not make annual reports of her doings as guardian. Her first report was filed on December 12, 1945, and was approved by the court, apparently ex parte, on January 2, 1946. She was at the same time allowed fees consisting of certain United States Savings bonds of the value of $356.25.

Her next report was filed on April 29, 1948. This report came to the attention of the district court, sitting in probate, shortly thereafter. It was apparently called to the court's attention by the clerk of the court, acting as referee in probate. The appellant and her counsel were forthwith directed to appear before the court on May 8, 1948. At this time the court accused appellant of extravagance, entered an order revoking all prior

authorizations for expenditures, directed appellant that she should make no further disbursements "for any purpose whatsoever", and set a further hearing for May 12 next. The court also ordered the transfer of all funds of the guardianship from a bank in Monticello, where appellant had kept her guardian's accounts for the farming operations, and all funds from a bank at Anamosa, where she had deposited moneys received from certain veteran's benefits to which her ward was entitled, to a bank in Manchester.

On May 12 the court repeated the charge of extravagance, called attention to what it deemed certain insufficiencies in the accounting, threatened to remove appellant from her position as guardian, reiterated its order of May 8 forbidding further expenditures, and ordered her to appear on May 19 next to show cause why she should not be removed. The appellant filed certain further reports in an attempt to clarify the matters to which the court called attention. She was severely cross-examined by the court at the various hearings. On May 19 the court entered an order authorizing the appellant to withdraw $150 per month for the support of herself and her family "after all current expenses and liabilities were paid", appointed a referee to investigate and report on the affairs and accountings of the guardianship, and appointed D. J. Dolphin, who has since appeared as counsel for the successor guardian, as guardian ad litem for the ward. A further hearing was set for July 8, 1948.

On July 8, 1948, objections were filed by the guardian ad litem to the guardian's accountings, and the report of the referee was on file. In substance, it found nothing materially wrong. The appellant appeared, was examined by the guardian ad litem and cross-examined again by the court. At the close of the hearing the court entered its order removing appellant as guardian, appointing George O. Greenway, a stranger to the family relationship and affairs, as successor, and ordering appellant to make over all assets of the guardianship to him forthwith under pain of incarceration in jail. Hearing on the accounting was continued to September 11, 1948, at which time "such reports and such objections, together with any other reports

and objections filed on or before September 1, 1948, shall come on for final hearing and determination."

On July 22, 1948, the attorneys who had represented the appellant throughout the guardianship and including the various hearings of May 12, May 19 and July 8 filed an application for the allowance of counsel fees in the sum of $150, which application was later denied in toto by the court.

On August 30, 1948, the guardian ad litem filed his amended and substituted objections to the appellant's reports. Under the order of the court made on July 8 it was upon these the hearing was to be had on September 11, since they were the only exceptions on file at that time. The matter came on for hearing on September 11. There was further examination of the appellant by her counsel and by the guardian ad litem. On April 15, 1949, the court entered its order disapproving the appellant's reports and accountings, finding a gross indebtedness to the estate of $7840.05 (of which only two items totaling $168.65 were included in the objections filed), and crediting appellant with $2813.92 as an offset, of which $1691.75 was an allowance for additional compensation as guardian. This left a net amount for which the guardian was required to account of $5026.13.

On April 25, 1949, appellant filed her motion to vacate and for new trial, and also a motion to require the court to make its findings more specific on several grounds. While these motions were in terms denied, the court did, on May 11, 1950, file its "Substitute Order Disapproving Report of Bertha Husmann, Guardian, and for Accounting." This order is in effect almost a total change of ground on the part of the court. It finds appellant indebted to the guardianship estate in the net amount of $6141.05, but the means of reaching this total, with the exception of two small items, was entirely different from that employed in the order of April 15, 1949. The gross indebtedness found by the court was $6414.05, with credits allowed of $278. Of the gross sum, $5614 is reached by determining appellant should be charged with one half of certain checks issued by her during the period of her guardianship totaling $11,228. She is charged with $431.40 expended by her for life insurance premiums upon the lives of her minor sons; with a

claimed loan made to Edward Husmann of $200; with $143.65 as the value of an automobile owned by the ward and traded in by her on the purchase price of a new car bought with her own funds and owned by her; and with $25 paid as the first installment on a house and lot in Manchester intended as a home for the family, the purchase of which the court afterward refused to approve. These last two items are the only ones mentioned in the objections to the reports upon which the court order of July 8 directed the hearing to be had, and they are the only ones which figured in the court's order and judgment of April 15, 1949. It will also be noted the court had changed its mind about allowing appellant compensation for her services. While the order of April 15, 1949, found her entitled to the sum of $1.00 per day during the period of the guardianship, in the total sum of $2048, the order of May 11, 1950, held her conduct to be such she was entitled to no compensation except that the previous allowance to her on which there was an unpaid balance of $238 was not disturbed.

Error is predicated by appellant upon three judgments of the court: (1) In finding her indebted to the estate in the sum of $6141.05; (2) in removing her as guardian; and (3) in refusing to allow the application for her attorney fees for the period between May 8 and July 8, 1948. We shall discuss these in order. Some further facts not set forth above will be referred to, and some of these will bear upon more than one of the three assigned errors.

I. The general statute governing the powers, duties and responsibilities of guardians is section 668.9, Code of Iowa, 1950, which we quote herewith:

"668.9 Duties. Guardians of the property of minors must prosecute and defend for their wards, may employ counsel therefor, lease lands, loan money, and in all other respects manage their affairs, under proper orders of the court or a judge thereof."

Likewise important is section 670.17, Code of Iowa, 1950, which we also set out:

"670.17 Allowance to family. The court shall, if necessary, set off to the wife and minor children of the insane person, or

to either, sufficient of his property, of such kind as it shall deem appropriate, to support them during the period such person is insane.''

With reference to section 668.9, supra, we have said: "It is our duty, by express legislative command, to construe this statute liberally, 'with a view to promote its objects and assist the parties in obtaining justice.'" In re Guardianship of Brice, 233 Iowa 183, 188, 8 N.W.2d 576, 579.

Certain other well-established principles must be kept in mind. They are aptly stated in Des Moines Savings Bank v. Krell, 176 Iowa 437, 441, 156 N.W. 858, 859, thus: "* * * the hearing upon this report was in probate and * * * the order of the trial court thereon will not be lightly disturbed. Not only has the finding of fact of the probate judge in such a case the force and effect of a verdict, but there is a degree of sound discretion that enters into the judgment of the probate court as to the nature and extent of expenditures which may be properly approved in a given case." See also In re Guardianship of Nelson, 148 Iowa 118, 121, 126 N.W. 973, Ann. Cas. 1912B 974. We have these rules in mind in our consideration of the instant case.

There was no substantial dispute in the records and evidence upon which the probate court acted. The problem for solution upon this appeal is therefore that of determining whether the uncontroverted facts and the fair inferences to be drawn from them justified the drastic action taken. The discretion exercised by the district court sitting in probate is broad, but not unlimited. It has its boundaries, and when they are overstepped it becomes our duty to so say when we consider the matter upon appeal. It is our conclusion the trial court got considerably over the line between the exercise of a fair discretion and the imposition of a substantial injustice not only upon the appellant, but, in effect, upon the ward and his family as a whole. We shall endeavor to explain the reason for this statement.

At the time her husband was committed to the hospital at Independence (he was later sent to the Veterans Hospital at Knoxville, where he is still confined), appellant found herself with a family of eight minor children and no assets except the

equipment which the Iowa tenant farmer ordinarily has. The family was a farm family; so far as we can judge from the record, appellant and her husband, when he was of sound mind, had throughout their married life engaged in farming. It is a fair assumption she knew no other occupation. She obtained permission of the court to carry on the farming business and to use guardianship funds to support her family. This she proceeded to do; and most successfully. The family was supported throughout the five and one-half years the court permitted her to act, and apparently supported reasonably well. There were few luxuries, but the children were provided for and educated. Appellant was not only the guardian; she was the head of the household. She kept the house and did much labor on the farm.

No claim is made by anyone that she personally profited by her use of the property of the estate or that she was in any way corrupt. Perhaps the family's standard of living became somewhat higher during the period of chimerical prosperity which swept over the country during and immediately following the war years. If so, it was no different from that of the great majority of the people. Whether this be true or not, when she was finally forced from the guardianship, she turned over to her successor more assets than had originally come into her hands; and this after making a living for a family of nine from the operation of a rented farm during the entire period.

Her accounting, while perhaps not that of a skilled bookkeeper, was still unusually detailed and careful for a farm woman with no previous experience. It covers many pages of the record herein, giving dates and payees of the various checks written and the items purchased. We must remember she was not a stranger to the ward or the family which it was his duty to support; and we think there is a substantial difference in the degree of meticulousness which should be required.

We approve the statement of the Michigan Supreme Court in In re Callaghan's Estate, 265 Mich. 288, 290, 251 N.W. 316, which we quote: "Where an executor, administrator or guardian is called upon to account, such accounting is governed by the broad principles of equity and it is at all times competent for the accounting party unimpeded by technical rules, to show the fairness of his dealings, the real nature of the

transaction *and to restrict the amount for which he should be held liable to that which equity demands."* (Italics supplied.) This is not to say the matter is tried in equity; but the court should endeavor to follow principles of fairness and justice. This is particularly true when the guardian is a member of the family and is endeavoring in a difficult situation to carry on a business and support the ward's family with meager resources, as was the case here. It was the ward's duty to support his family, and it was for his interest that the guardian do this properly for him, from his estate.

■ Specifically, the court found objectionable a practice followed by the appellant in obtaining cash for miscellaneous family needs. It appeared throughout her accounting in both the first and second reports that she often purchased necessary items, generally groceries, by giving checks therefor in amounts larger than the actual amount of supplies required. The balance was paid to her by the merchant in cash. This, she says, was used for school lunches and supplies for the children, spending money for them, church donations, and many other small items. She testified, under examination by the court, that about one half of the amount listed for groceries and other merchandise purchased by checks of five, ten, fifteen and twenty dollars was cash used in this way. There was no showing she benefited in any way from the money so received or that it was expended extravagantly or for unnecessary or impractical items. Granted it 'would have been better if she had itemized these generally small items specifically, under the circumstances we can find no justification for the court's finding charging her with one half of the checks so written, in the sum of $5614. It will be observed the court in its first order and judgment of April 15, 1949, made no such charge, but proceeded on an entirely different theory. It was only after appellant's motion to vacate this order that the court set it aside and, without further evidence, mended its hold and proceeded upon an entirely new line. It is also to be noted that the first report of appellant showing the identical method of operation was approved by the same court on January 2, 1946. Without doubt a partial report, approved ex parte, is not binding on the final accounting; yet the injustice of approval of the intermediate report, thus leading

the guardian to believe her practices are proper so that she continues them thereafter, until she learns of objections for the first time on a later report, when her possible liability has been greatly increased, is manifest. We think the court exceeded any fair discretion in charging appellant with this item of $5614. As to these items her reports should be approved.

The court also charged the appellant with the sum of $431.40 which she had expended for life insurance premiums for her minor sons. Some of these expenditures likewise appeared in the first report and accounting which was approved, and the same injustice as to the unfairness of a later change in position by the court is apparent. The court by approving the first report in effect approved the expenditures for insurance and authorized their continuance. The appellant testified her husband would have approved the purchase of life insurance for the boys; she thought they had earned it, that it was a savings for them and would encourage them in the future. It is common knowledge that life insurance is both an investment and a protection, and that it can be purchased for less for younger persons; that the cost increases progressively with advancing age. In In re Guardianship of Benson, 213 Iowa 492, 499, 500, 239 N.W. 79, 82, we disapproved a purchase of life insurance for minor wards. But there was some evidence the guardian profited by receiving a share of the commissions; he was a stranger to the family; the policies had been permitted to lapse, and we said: "There is nothing in the record to show that it was necessary or desirable that the wards have these policies." We think there is such a showing here, and that the court by its approval of the first report gave its sanction to the expenditures. The appellant should not be charged with this item.

Next, the court found appellant should be charged with the sum of $200 which first appeared in her reports as a loan to Edward Husmann, one of the sons who had reached his majority. But on her examination she stated this was an error, that it was in fact a payment for labor performed on the farm. There is nothing in the record to contradict this testimony, and the item should not be charged to her.

One of the remaining two items is the value of the automobile not listed in appellant's inventory, and traded in by

her when she purchased a new car for herself in December of 1947. This is a proper charge, in the sum of $143.65 as fixed by the court. As against this, however, appellant should be allowed to show the value of the use of her own car in the farm business and for the support and general use of the family. She testifies she purchased it with her own funds, her only substantial resource, for the family's use and it was so used.

The final charge is a $25 item, the amount paid down by appellant on the purchase of a dwelling property in Manchester. She had contracted for this in the spring of 1948, shortly before her second report which drew the criticism of the court was filed. She promptly asked authority to make this purchase, alleging she was engaged in operating the rented farm in partnership with an adult son, who had a family, and there was no room in the house there for both families. It was her intention to continue this farming arrangement, which seems to have been working out satisfactorily, after removing with her minor children to the town. This matter coming before the court after the trouble over the second report had developed, authority was denied. Since the appointment of the successor guardian, the court has approved the purchase of another home for the family in Manchester. However, we cannot say the court abused its authority in disallowing this item.

The only two items challenged by the objections filed by the guardian ad litem and which were sustained by the court were the two small ones last referred to. Other objections of the guardian ad litem were disregarded by the court, which made its own case against the appellant. The appellant now complains the court went beyond the issues made in charging her with items not objected to. The court's order fixing the hearing on appellant's reports for September 11, 1948, specifically recited that it should be on the reports and such objections as might be filed on or before September 1. There is authority for appellant's position here. In re Estate of Smith, 223 Iowa 172, 176, 271 N.W. 888, 890; 39 C. J. S., Guardian and Ward, section 155, page 260, where it is said: "The evidence must be confined to the issues raised by the exceptions and the account."; In re Estates of Boyes, 151 Cal. 143, 90 P. 454; State ex rel. Fleming v. Shackelford, 263 Mo. 52, 172 S.W. 347. On

the hearing in question, it was the duty of the court to confine itself to the issues in conformity to its order of July 8, 1948. But since the court should in no event allow improper expenditures, we have preferred to discuss the matter on the merits of the items actually disapproved.

■ II. The second error assigned by the appellant is that the court should not have removed her as guardian. Here again the discretion of the court is considerable. There is no doubt the guardian failed to render yearly accounts, as required by section 668.24, Code of Iowa, 1950. But this is a rule often disregarded. It is frequently considered a needless expense and waste of time, and the penalty of removal is seldom enforced for this minor dereliction in the absence of other evidence showing improper conduct on the part of the guardian. She was appointed in November 1942; her first report was not made until three years later. Yet the court approved it without comment ,or criticism. It must be conceded all guardians will be better advised to make annual reports, or to obtain court permission to account at longer intervals. But we do not think the delay here in itself justified the order of removal.

■ The court also found appellant had refused to obey orders of the court, specifically those of May 8 and May 19, 1948. We assume these were the orders prohibiting her from making any expenditures, without permission, and the order of May 19 allowing her $150 per month for the support of the family, but permitting her to draw these sums only after all outstanding indebtednesses were paid, and directing her to make no expenditures exceeding $100 in amount without authorization. She violated these orders by paying three debts which had been owed or contracted for some months earlier, and purchasing two or three very trivial items which the family needed; and she paid herself the $150 per month allowance when there were some outstanding unpaid obligations. The court in its orders of May 8 and May 12 prohibiting her from making any expenditures whatever disregarded section 670.17, supra. The guardian was left without any means of support for herself and family. Nevertheless, she violated this order only by paying for some grain purchased several months before, when the creditor demanded his money; and by a few very trivial purchases, amount-

ing in all to less than $20. She likewise paid two outstanding obligations after the order of May 19, which were in excess of the $100 limit fixed, and she wrote checks for family support as allowed when there were current bills unpaid. Again the pinch of necessity was evident; it is to be remarked the court's orders were not only in disregard of the statute, but harsh in their effect. The guardian also neglected to transfer her bank account from the Jones County banks to one in Manchester. No one contends there was any insecurity in the chosen depositaries, nor in fact that any harm to the estate arose from any of her failures to obey the court's orders. We do not condone willful disregard of the court's authority by fiduciaries in estates and guardianship matters, but we find here no intent to defy the court, no resulting harm, and in view of the unnecessary stringency of the orders themselves and the necessities of the appellant and her family, we think she should not have been removed and is entitled to reinstatement.

 III. Appellant's attorneys requested an allowance of $150 as fees for services rendered to the estate from May 8, 1948. to July 8, 1948. These were disallowed by the court, for the stated reason the services were rendered to the appellant individually rather than as guardian. Again we disagree with the probate court. The guardian's reports were under fire, and she attempted to make them conform to what she thought was the form and substance desired by the court. She appeared to explain and justify them. She was entitled to the aid of counsel in so doing, and we cannot say such aid was not rendered to the estate rather than to the appellant individually. It is not contended the fees asked are excessive, and they should be allowed. See In re Guardianship of Burgy, Iowa, 257 N.W. 791.

 IV. This case seems to us to be peculiarly one in which the discretion of the court should be exercised in favor of the guardian. We have pointed out the burden cast upon her by the mental illness of her husband, and the manner in which she carried it. The record shows her tremendous efforts to carry on and support her family, which was also the duty of her ward. She worked from twelve to sixteen hours a day at her various duties. She had the complete affection and confidence

of her children, and there is no word of criticism of the manner of their upbringing or conduct. She profited nothing except that she got her living from the guardianship. Surely a wise discretion on the part of the court would not have held her to the closest and most meticulous accounting, nor have removed her for minor mistakes which damaged no one. We quote from 25 Am. Jur., Guardian and Ward, section 61: "The guardian is virtually a free agent so long as he is guilty of no acts detrimental to his ward; in handling the estate he exercises his own judgment * * *." We ourselves have said: "There was no application for removal of the guardian. Action of this character should not be taken unless the court is satisfied that the interests of the ward have not been properly protected." In re Guardianship of Ridpath, 231 Iowa 977, 983, 984, 2 N.W.2d 651, 654. Who can justly say this farm wife and mother has been guilty of any acts detrimental to her ward or his interests have not been properly safeguarded? Here, as in the Ridpath case, supra, there was no application for removal of the guardian. The matter came up entirely upon the initiative of the court. No one, other than the court and its guardian ad litem, found anything objectionable or lacking in the conduct of the guardian or in her reports. The United States Veterans Administration and the Administrator of Veterans Affairs are named as appellees in this appeal, but there is no apparent reason for so joining them. They filed no objections and took no part in the proceedings.

True it is that the court has a duty to observe the doings of its fiduciaries and to inspect their reports, but before removing a guardian or charging him with derelictions it should be certain cause therefor sufficiently appears.

The result of the probate court's interference in this matter strengthens our conclusion that it went beyond a just discretion in removing the appellant, charging her with large sums, and refusing to allow her counsel fees. The proof of the pudding is in the eating; and while it is not always that the effect of a cause can be accurately predicted in advance, we think the result of the court's interposition here should have been almost certainly apparent.

Upon appellant's removal the court appointed a successor guardian, who took charge of affairs, and some of his doings are shown by the record. He determined it was not feasible to continue the farming operations which under appellant's guidance had supported the family for several years. He held a farm sale and disposed of the assets, moving appellant and her family into town. The result of this has been a most marked diminution of income from the trust property. During appellant's tenure there was at first an allowance from the Veterans Administration; later, when she brought the income up above $2500 per year, this allowance was discontinued. But under the new guardian the income promptly shrank to the point where the rules of the Veterans Administration again permitted the allowance. It was a left-handed way of securing the government dispensation, and the total income of the estate is now much less than the appellant had been realizing from the farming operations alone. In fact, it must have been apparent to anyone that to close out the farming business by selling the livestock and machinery and investing the proceeds in the best-known manner consistent with safety would bring in only a small fraction of what the same property would net when used in a going operation on the farm.

Further, the expense of the method adopted by the court throws a revealing light on the question of the judicial discretion or lack thereof involved. Within eighteen months after the removal of appellant, the fees allowed to the successor guardian, his attorney, the guardian ad litem and the referee amounted to $1460.52. During all of appellant's tenure she had netted fees of less than $150, and her attorneys only slightly more, in all, about $300. It is evident the interest taken in this matter by the trial court, however well-intentioned, has resulted in little less than disaster to the guardianship. It has put appellant out of the only business she knew and for which the slender resources of the estate were fitted, and has resulted in heavy expense to the meager funds of the guardianship. We reverse the orders of the court; we cannot restore the status quo.

The question of the long delay in bringing this matter to us on appeal is one for which we are given no answer. It is un-

846

fortunate that it has been four years from the final order of the lower court to a presentation of the appeal here, and it makes the situation all the more difficult to remedy.

The matter of proper taxation of costs is likewise one which defies a just solution. They must be taxed to the appellee guardian and guardian ad litem; but no matter to which guardian the costs are taxed, they will eventually be paid by the guardianship estate, and here again the situation is regrettable but unavoidable. However, as to the cost of printing the record, for which appellant asks the sum of $3.00 per page, or a total of $852, we think only one half of this may be taxed in the case. All other papers in the case were satisfactorily printed at $1.00 per page, and we cannot sanction the amount asked for the record.

The orders and judgments of the district court are reversed and the cause remanded, with directions to proceed in accordance with the foregoing opinion.—Reversed, with directions.

All JUSTICES concur.