# IN THE COURT OF APPEALS OF IOWA

No. 17-0049
Filed July 19, 2017

IN RE THE MARRIAGE OF CARA RENEE SPENCER
AND CHRIS SPENCER

Upon the Petition of
CARA RENEE SPENCER,
    Petitioner-Appellant,

And Concerning
CHRIS SPENCER,
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Marshall County, John J. Haney, Judge.

In a dissolution-of-marriage appeal, a former wife challenges the joint-physical-care arrangement for their son and the award of the parties' acreage to her former husband. **AFFIRMED.**

Barry S. Kaplan and C. Aron Vaughn of Kaplan & Frese, L.L.P., Marshalltown, for appellant.

Bethany J. Currie of Peglow, O'Hare & See, P.L.C., Marshalltown, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and Mulllins, JJ.

**TABOR, Judge.**

In this appeal, Cara Spencer lodges two objections to the decree dissolving her marriage to Chris Spencer. First, she asserts joint physical care is not in the best interests of their son, M.C.S. Second, she contends awarding the farm property they purchased during the marriage to Chris was inequitable. Considering the factors set out by our legislature and prior court decisions, we reach the same result as the district court on both the custody and property issues.

## I.       Facts and Prior Proceedings

After graduating from Simpson College in 2001, Cara took a job in Dallas, Texas, where she met her future husband, Chris Spencer. Chris had received an architecture degree from Texas Tech. Cara and Chris married in 2002. Their only child, M.C.S., was born in 2011. After his birth, the couple decided to move to Tama, Iowa, where Cara grew up. Cara's parents still lived in Tama County and Chris's parents, native Texans, soon joined the family in Iowa. M.C.S. enjoys a close relationship with both sets of grandparents.

Both Cara and Chris have been employed outside the home throughout the marriage. Chris served as a city planner in Texas, and in Iowa he worked for the Meskwaki Tribe, first as a natural resources director and later as a grant writer and planner. He earned about $70,000 annually. Cara had a job with Raytheon in Texas, eventually worked for Pioneer in Toledo, and at the time of trial, worked as an employment manager at Iowa Premium Beef in Tama. Her annual salary was approximately $72,000.

Once settled in Iowa, Chris and Cara bought a house in Tama, and later a small farm—just shy of twenty acres—outside of Toledo. The Spencers' rural property is located just a mile from the farm where Cara grew up and where her parents still live. Cara's parents rented the parties' farm ground for eighteen years, paying $750 per year to plant row crops on about six acres and to use the remaining pastures to run cattle. Cara and Chris tore down the old farm house and planned to build a new one, but their plans never came to fruition. The farm cost $82,000, but at the time of trial it was worth only $60,000—the same amount the couple owed on the purchase. Cara wanted the farm after the divorce, testifying, "I still fully plan on building on it and living there." She explained her attachment to the property stemmed from its proximity to her parents' land. Similarly, Chris testified he still would like to build a house on the farm, and his parents lived nearby as well. Chris testified he pushed for the original purchase of the property because he wanted their son to have a chance to grow up in the country. As "an avid hunter," Chris sought access to the timber to shoot turkey and deer. He also expressed a desire to raise cattle on the land.

Chris was diagnosed with a brain tumor in November 2015 and underwent surgery in January 2016. He suffered some residual speech difficulties and did not have full use of his left hand at the time of the trial. Otherwise, Chris, Cara, and M.C.S. were in good health.

Cara filed a petition to dissolve the marriage in May 2016. During their separation, Cara and Chris used a shared-care arrangement, without court intervention, in which M.C.S. would go back and forth between the parents every other day. After holding trial in early December 2016, the district court issued the

decree later that month. The court granted Chris and Cara joint legal custody of M.C.S., as well as joint physical care. Per the agreement of the parties, the court awarded Cara the marital home in Tama, which had equity of $13,138. The court awarded Chris the farm property, along with its associated debt.

Cara now appeals.

## II. Standard of Review

We review equity actions, including dissolutions of marriage, de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013); *see also* Iowa Code § 598.3 (2016); Iowa R. App. P. 6.907. De novo review means we examine the entire record and adjudicate the issues anew. *Id.* While they are not binding, we give weight to the district court's factual findings, particularly concerning witness credibility. Iowa R. App. P. 6.904(3)(g). We will disturb the district court's rulings only when they fail to provide an equitable resolution. *McDermott*, 827 N.W.2d at 676.

## III. Discussion of Cara's Claims

## A. Joint Physical Care of M.C.S.

Custody decisions must assure a child of divorce the "maximum continuing physical and emotional contact with both parents" that is reasonable and in the child's best interests. Iowa Code § 598.41(1)(a). The legislature set out multiple factors for courts to consider when determining the optimal care arrangement.[1] *See id.* § 598.41(3). We also look to the non-exclusive factors

---

[1] As relevant here, a court shall consider: (a) "whether each parent would be a suitable custodian for the child"; (b) whether the child's psychological and emotional needs and development "will suffer from a lack of active contact with and attention from both parents"; (c) whether, as to the child's needs, the parents can communicate with each

articulated in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (including the child's needs, the parents' characteristics, the relationship between the child and each parent, and the stability and wholesomeness of the proposed environment). In this case, both parents are suitable custodians who are able to attend to the child's needs.

When considering whether joint physical care is right for M.C.S., we turn to *In re Marriage of Hansen*, where our supreme court discussed in detail the relative pros and cons of shared-care arrangements. 733 N.W.2d 683, 690 (Iowa 2007). As a core principle, the court opined: "Physical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child.*" *Id.* at 695. The *Hansen* court rejected the notion one spouse could exercise "absolute veto power" over whether the district court awarded joint physical care. *Id.* at 699. But the court also warned: "[T]he lack of mutual acceptance can be an indicator of instability in the relationship that may impair the successful exercise of joint physical care." *Id.*

At trial, Chris favored joint physical care, while Cara did not. The district court decided shared care was in M.C.S.'s best interests, reasoning: "Despite their differences and Cara's expressed concerns about Chris, they have shared care of their child since they separated. All indications are that the child is doing quite well with the shared care arrangement." On appeal, Cara contests the

---

other; (d) whether both parents actively cared for the child before and after they separated; (e) whether each parent can support the other's relationship with the child; (f) [the child's wishes]; (g) "whether one or both the parents agree or are opposed to joint custody"; (h) the parents' geographic proximity; and (i) whether the child's safety or the other parent's safety "will be jeopardized by the awarding of joint custody." Iowa Code § 598.41(3).

district court's determination that shared care was in the best interests of M.C.S., who was five years old at the time of the trial. Her concerns fall into two categories: difficulty in communication between her and Chris and Chris's past consumption of alcohol to excess.

We address these concerns in reverse order. Cara and Chris both testified about Chris's alcohol consumption. Cara recalled incidents of his heavy drinking during the marriage. Chris countered that he and Cara were both social drinkers. He admitted times when he had become intoxicated, but he downplayed any impact those experiences would have on his ability to continue joint physical care of their son. Chris also testified he stopped drinking in the months before and after his brain surgery and has continued his sobriety during the separation. The district court took Cara's concerns into account when reaching the shared-care decision but noted the parties presented "no credible safety concerns for the child with either parent."

Our de novo review brings us to the same conclusion as the district court. *See In re Marriage of Bulanda*, 451 N.W.2d 15, 18 (Iowa Ct. App. 1989) (adopting district court's findings as to father's ability to continue his sobriety and safely parent because "trial court had the opportunity to observe the witnesses and assess their credibility"). Cara has no qualms about Chris having extraordinary visitation with M.C.S., signaling she did not believe his history of alcohol use posed a danger to their son. Accordingly, we do not find Cara's unease about Chris's history of alcohol use to be a basis to modify joint physical care.

As for the parties' difficulty in communicating, we find Cara's concerns are overstated. She testified, after she filed the petition, Chris would send her as many as thirty text messages per day about preserving their marriage. But she acknowledged, when she did not respond, the messages "fizzled" out. The other instances of hostile or uncomfortable encounters outlined in Cara's testimony occurred in the heat of the dissolution proceedings. Our courts recognize "certain natural animosities exist during a divorce." *See In re Marriage of Downing*, 432 N.W.2d 692, 694 (Iowa Ct. App. 1988). When reviewing the testimony from Cara and Chris, the district court observed, "their communication appears to have improved as the time from their initial separation lengthens." The court also found "both [parents] can and are supportive of the other's relationship with the child." We agree with the district court's conclusions.

An old expression is apt here: "all the proof of the pudding is in the eating." *See generally In re Husmann's Guardianship*, 64 N.W.2d 252, 260 (Iowa 1954). That is to say, to test the effectiveness of a proposed action, one needs to try it out. Here, Cara and Chris tried out a demanding shared-care arrangement, requiring them to coordinate daily exchanges of M.C.S. for at least seven months without any court intervention. Cara admits they have been able to communicate about work schedules and when the child would need to be picked up. They have also communicated about the child's doctor appointments and medications. As a result of the parents' sincere efforts during their separation, M.C.S. was thriving under the shared-care arrangement—according to all the evidence presented at trial. This successful, joint-care experience looms as a "significant

factor" in determining "the viability of joint physical care after divorce." *See Hansen*, 733 N.W.2d at 697.

Here, we have two committed and loving parents; they live in close geographic proximity to each other and to supportive extended families, and they have already succeeded in balancing M.C.S.'s time between two homes. Given these circumstances, joint physical care is in M.C.S.'s best interests.

## B. Award of Farm Property

Next up is Cara's request we modify the decree to award her the farm. The district court aptly summarized the property issue:

> Cara wants the farm. Chris wants the farm. There is no equity in this parcel. Chris expressed a desire to develop this property for hunting as well as building a home on the property. Cara also expressed a desire to build a home on the property, and her parents have rented the parcel for [eighteen] years. Since Cara is getting the marital home, the [c]ourt believes awarding the farm parcel and debt associated therewith to Chris is fair and equitable.

According to Cara's brief, "[t]he two key factors here are [her] family's longstanding connection to the land and the fact that there is no equity in the property." She recognizes "the farm is a wash" as far as an economic benefit to either party. Her desire for the land is sentimental.

Chris questions the significance of the tie Cara claims her family has to this land, contending "the identity of a tenant who pays $750 to farm about six acres of a 19-acre parcel should not be a controlling factor for the court's consideration." He notes their marital home, which the court awarded to Cara, is only three miles from her parent's farm so she remains "very close to her childhood home."

"Iowa is an equitable distribution state." *McDermott*, 827 N.W.2d at 678 (discussing factors for equitably dividing property listed in section 598.21(5)). One of the equities to be considered is a party's "strong interest" in maintaining a family farm, and Iowa precedent "acknowledges the public policy in favor of preserving family farming operations." *Id.* at 683. But that public policy is not at play here. Neither Cara nor Chris farmed the nineteen acres in question. Award of the property to either party would likely "inure to the eventual benefit" of their son. *See In re Marriage of Andersen*, 243 N.W.2d 562, 564 (Iowa 1976). The district court ordered an equitable distribution of the property. We decline to modify the decree.

## IV.    Appellate Attorney Fees

Finally, we address Chris's request for attorney fees to defend the district court's decision on appeal. He asks for $5233.50 in fees. Although we do not award appellate attorney fees as a matter of right, we may do so as a matter of discretion. *In re Marriage of Hoffman*, 891 N.W.2d 849, 852 (Iowa Ct. App. 2016). In exercising our discretion, "we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *Id.* Here, both parties are on equal financial footing, but because Cara's appeal required Chris to defend, we award him $3000 in appellate attorney fees. Costs are assessed to Cara.

**AFFIRMED.**