# IN THE COURT OF APPEALS OF IOWA

No. 24-0633
Filed April 9, 2025

**IN THE MATTER OF THE GUARDIANSHIP OF ACEA JAMISON HACKERT**

**CYNTHIA MICHELE HACKERT,**
Appellant.

_____

Appeal from the Iowa District Court for Jasper County, Stacy Ritchie, Judge.


A mother appeals the district court's order removing her as co-guardian for her adult son with disabilities. **AFFIRMED.**


Eugene L. Nassif of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Lucas W. Otto, Otto Law Office, PLLC, Newton, for appellee.


Considered without oral argument by Schumacher, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

Cynthia and Jamie Hackert were successful caregivers for their son with disabilities, Acea, throughout his childhood. When he turned eighteen, they sought appointment as his guardians—a role they intended to share even after they dissolved their marriage. But in the wake of the divorce, Cynthia's anger towards Jamie interfered with her ability to collaborate in Acea's care and act in his best interests. The district court removed Cynthia from her role as co-guardian, finding her inconsistent performance and hostility to other caregivers amounted to a failure of duty. Finding no abuse of discretion, we affirm.

## I.     Background Facts and Proceedings

Acea Hackert is the adult son of Jamie and Cynthia Hackert. He lives with significant cognitive and physical impairments that limit his ability to walk, communicate, and eat. Acea depends on others to meet his basic needs and requires around-the-clock care. Jamie and Cynthia shared those responsibilities when Acea was a child. On the day Acea turned eighteen, his parents asked to be named his permanent legal guardians. The district court granted their request and appointed them as co-guardians in December 2021.

When they were appointed, Jamie and Cynthia were in the process of dissolving their marriage. In a stipulated decree filed in February 2022, both parties agreed to care for Acea "approximately one-half of the time." Jamie and Acea would continue living in the marital home—which had been custom-built for Acea's needs—and Cynthia could visit Acea there provided she gave Jamie advance notice. The co-guardians also planned to enlist the help of respite

workers they had used during the marriage to fill the gaps in Acea's supervision schedule.

Things did not go as the parties had hoped. In May, Cynthia went to Jamie's house unannounced. Jamie asked her to leave, and she punched him in the face. Although an officer observed swelling around Jamie's eye, Cynthia denied any assault. Her text messages to Jamie around this time were persistently instigating and insulting.[1] Cynthia also butted heads with Acea's service providers. Although Jamie coordinated all of Acea's respite care, Cynthia distrusted the workers he chose. She canceled some caregivers' shifts and unilaterally attempted to fire others, with no backup plan. One respite worker blocked Cynthia's number after Cynthia berated her for turning off Acea's camera and failing to answer phone calls.[2] Similar hostility caused Acea's case manager—who had worked with him for sixteen years—to seek reassignment. The case manager who took over said this was one of the most problematic guardianships she had seen in her career. At school, confrontations between Cynthia and teachers led to intervention by administrators. Acea's principal banned Cynthia from entering the school building without pre-approval and an escort. When Cynthia refused to follow that policy, teachers raised safety concerns.

Cooperation did not improve with time. Although Acea began to travel to Cynthia's house for visits, scheduling continued to be a problem. Cynthia often

---

[1] As just one example among many, Cynthia texted Jamie at the beginning of May that if his new girlfriend "comes near Acea again[,] I'll rip her face off." Jamie simply responded, "I get it." There are many more, and worse, messages from Cynthia that we do not find it necessary to repeat.

[2] That respite worker was at an out-of-state conference at the time, and a different caregiver was with Acea.

changed the times and days of the visits or canceled them altogether, which made scheduling and retaining respite workers hard. It also put Acea in danger of having no one there to care for him while Jamie was working. Text exchanges in late 2022 and early 2023 describe ongoing disputes over Acea's transportation and supervision. Cynthia's communication with Jamie about Acea's care remained stubborn, biting, and almost always interlaced with personal grievances. For instance, in late October 2022, Cynthia texted Jamie, "Who the hell is taking care of my child. It better not be hag," which is how she referred to Jamie's new wife. Jamie responded with the name of the caregiver and told Cynthia, "Knock it off and grow up."

After more than a year of conflict, Jamie filed a motion to remove Cynthia as Acea's co-guardian. He pointed to her inconsistent visitation, interference with Acea's daily care, and "spite stemming from the parties' divorce." Cynthia resisted, arguing Jamie had overstepped his authority by making decisions without her input and by restricting her from seeing Acea. The district court appointed a court visitor to investigate the parties' allegations. *See* Iowa Code § 633.562 (2023). Following interviews with Jamie, Cynthia, and seventeen other witnesses, the court visitor reported that the co-guardian framework was no longer in Acea's best interests and recommended that Jamie be appointed as sole guardian. The court visitor noted that while neither party was entirely without fault, Cynthia was "unequivocally the instigator of unnecessary conflict" with Jamie and Acea's caregivers, making it "nearly impossible to get a decision made."

At an evidentiary hearing in March 2024, Jamie testified that Cynthia had made no progress in her communication, cooperation, or adherence to schedules,

even though they had attempted to resolve their dispute with a detailed co-guardian agreement. He testified that arranging respite care had only become more difficult, as clashes with Cynthia caused several providers to resign. Jamie also noted that, until one week before the hearing, Cynthia had neither scheduled nor attended any of Acea's appointments. He acknowledged, however, that he sometimes declined to tell Cynthia about them because he "did not want to be confronted in a parking lot."

Cynthia denied acting against Acea's best interests, emphasizing her contributions to his education and a recent effort to arrange his physical therapy. She testified that she had tried to participate in other areas of Acea's life, but that "most of the time [she] never knew about what was going on" because she was not invited to appointments and meetings. Cynthia conceded her availability was sometimes unpredictable and that her relationships with Acea's respite care providers had deteriorated after the divorce. She denied being hard to work with, although the court visitor's report noted, "Most neutral individuals I interviewed stated . . . that [Cynthia] is incredibly difficult to get along with, has poor communication skills, is a contrarian, and has an aggressive demeanor." Cynthia acknowledged her communication was "not the best," but she maintained that her relationship with Jamie was "still evolving and the communication [was] changing."

Ruling from the bench, the district court found that Cynthia had failed her duty as co-guardian "to make decisions regarding Acea's care, maintenance, health, education, welfare, and safety that are in his best interest." Among other conduct, the court cited Cynthia's hostile communication habits, lack of a consistent visitation schedule, and failure to "engage in a meaningful conversation"

with Jamie about her concerns with Acea's caregivers. The court also found Cynthia had failed to show "sound judgment with regard to professional services." The court discredited Cynthia's denials of fault and assurances of cooperation, finding her testimony generally not credible. While the court did not doubt Cynthia's love for Acea, the court found that she could not continue as his co-guardian. Following the hearing, the court entered an order removing Cynthia as co-guardian and naming Jamie as Acea's sole guardian.

Cynthia appeals. She argues the district court gave improper weight to the parties' disagreements and that it "failed to consider the numerous instances where Jamie had prevented [her] from exercising her rights as Co-Guardian." She also argues that removal was premature because "Jamie did not follow the dispute resolution process pursuant to Iowa Code section 633.76."

## II.        Standard of Review

A petition to remove a guardian is triable in equity, and so the scope of our review is de novo. *See* Iowa Code § 633.33; *In re Guardianship of Hedin*, 528 N.W.2d 567, 581 (Iowa 1995). The district court's factual findings are entitled to weight—especially when they concern the credibility of witnesses—but they are not binding on appeal. *In re Guardianship of Johnson*, No. 22-0562, 2023 WL 2396534, at *3 (Iowa Ct. App. Mar. 8, 2023).

Although we review the facts anew, we give deference to the district court's ruling. *See In re Cannon's Guardianship*, 1 N.W.2d 217, 220 (Iowa 1941) ("[T]he removal of [a] guardian[] rests in the sound discretion of the court and we will not interfere, where there is some basis for the order."). Our task is to "examine the

record de novo to determine whether there was an abuse of discretion." *Schildberg v. Schildberg*, 461 N.W.2d 186, 190 (Iowa 1990).

## III.     Removal of Co-Guardian

"While the district court has great discretion in the removal of guardians, there must be some cause for removal." *In re Guardianship of Nobiling*, No. 14-1847, 2016 WL 757410, at *3 (Iowa Ct. App. Feb. 24, 2016) (citing *In re Husmann's Guardianship*, 64 N.W.2d 252, 260 (Iowa 1954)). Among other circumstances defined by statute, cause for removal exists when a guardian has "failed to perform any duty imposed by law." Iowa Code § 633.65. Removal is also appropriate where a guardian is "unsuitable," *id.* § 633.63(1)(b), including where the court has reasonable doubt about the guardian's ability to "act honorably, intelligently, efficiently, promptly, fairly and dispassionately," *Johnson*, 2023 WL 2396534, at *4 (quoting *In re Est. of Ragan*, 541 N.W.2d 859, 861 (Iowa 1995)).

The district court found clear and convincing evidence that Cynthia should be removed for her failure to perform certain duties required of her as Acea's guardian, including "[m]aking decisions regarding [his] care, maintenance, health, education, welfare, and safety" and "[c]onsenting to and arranging for [his] needed professional services." Iowa Code § 633.635(2)(a), (f). Cynthia contends she fulfilled these roles. She points to her success securing Acea additional time in school by appealing an IEP decision that would have required him to graduate. Cynthia also cites her efforts to obtain leg braces and physical therapy for Acea.

Nobody disputes that Cynthia is a loving mother. But Cynthia must be evaluated strictly for her performance as a legal guardian. *In re Guardianship of*

*M.E.B.*, No. 06–0583, 2007 WL 1345895, at *5 (Iowa Ct. App. May 9, 2007) (finding there is no parental preference in the guardianship of an adult with disabilities). In that capacity, her contributions to Acea's wellbeing are overshadowed by her inconsistency and hostility. Cynthia was unreliable when it came to visitation, causing disruptions in Acea's schedule. She failed to coordinate backup care, even when unavailable for her own shifts on short notice to Jamie. Cynthia distrusted Jamie's choice of respite providers—including those who had cared for Acea during the marriage—and attempted to fire them without forethought. She declined to attend some of Acea's appointments and had to ask Jamie for the name of Acea's doctor for the past four years. As the court visitor concluded, the evidence showed that Cynthia "took a back seat" in Acea's care, "and when she decided to be involved, she caused a major amount of disharmony."

Cynthia is correct that mere disagreement between co-guardians is typically not a cause for removal. *See Nobiling*, 2016 WL 757410, at *3 & n.1; *see also Schildberg*, 461 N.W.2d at 193 (explaining "mere friction" is not enough to justify removal of a fiduciary). But Cynthia's conduct went beyond disagreement. She overwhelmed channels of communication with personal grievance. And she alienated Acea's educators and care providers through her confrontational attitude. Nearly all the witnesses the court visitor interviewed described Cynthia's hostility as an obstruction to Acea's care. Even if this behavior were not an outright abdication of duty, it certainly "creates reasonable doubt" as to Cynthia's ability to serve as an efficient, fair, and dispassionate fiduciary. *Johnson*, 2023 WL 2396534, at *4 (finding a guardian unsuitable where, during a period of mental

health crisis, her unpredictable behavior caused disruption for the protected person and led to multiple police interventions).

Cynthia argues that Jamie could have asked the district court to moderate their conflict before seeking removal. *See* Iowa Code § 633.76 (providing that co-guardians who "cannot concur upon the exercise of any power . . . may apply to the court for directions"). But again, this was not a case of mere gridlock. Cynthia's resentment towards Jamie and her abrasive treatment of other caregivers actively interfered with Acea's best interests. In any event, she offers no authority to suggest a co-guardian must exhaust remedies under section 633.76 before seeking removal. We find no such prerequisite in the text of the removal statute. *See* Iowa Code § 633.65 ("When any fiduciary is, or becomes, disqualified under sections 633.63 and 633.64, [or] . . . fail[s] to perform any duty imposed by law . . . then the court may remove the fiduciary.").

Addressing Cynthia at the removal hearing, the district court summarized its findings as follows:

> [D]ivorces can be nasty. They can be ugly. Things are said. We have feelings that are not necessarily compatible with respect, dignity, adequate communications—but you let that overtake your main priority which was caring for Acea. You have to find it yourself, ma'am, to love Acea more . . . than you hate Mr. Hackert or his new wife. The evidence does not show that.

Upon our de novo review, we agree and find that the court did not abuse its discretion by removing Cynthia as co-guardian. *See* Iowa Code §§ 633.63, .65.

## IV. Appellate Attorney Fees

Jamie requests an award of $5000 in appellate attorney fees from Cynthia, but he does not identify any statutory authority for such an award. *See Iowa*

*Individual Health Benefit Reins. Ass'n v. State Univ. of Iowa*, 999 N.W.2d 656, 668 (Iowa 2023) ("Generally, attorney fees and costs 'are recoverable only by statute or under a contract.'" (citation omitted)). Assuming without deciding that we have authority to order Cynthia to pay Jamie's appellate attorney fees, we deny his request.

**V.    Conclusion**

For the reasons discussed above, we affirm the district court's order removing Cynthia Hackert as co-guardian of Acea Hackert.

**AFFIRMED.**